**UNITED STATES of America**

v.

**Victor J. ORSINGER, Appellant.**

**No. 22756.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1970.

Decided June 3, 1970.

Petition for Rehearing Denied July 1, 1970.

Messrs. F. Joseph Donohue and Theodore Kligman, Washington, D. C., for appellant.

Mr. Robert W. Ogren, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Seymour Glanzer, Asst. U. S. Attys., William P. Sullivan and Miss JoAnne LeVeque, Attys., Securities and Exchange Commission, were on the brief, for appellee. Mr. Roger E. Zuckerman, Asst. U. S. Atty., also entered an appearance for appellee.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

ROBB, Circuit Judge:

The appellant was indicted in fifteen counts. Counts one, two and three charged fraud by wire (18 U.S.C. § 1343), counts four and five, mail fraud (18 U.S.C. § 1341), count six, interstate transportation of a check taken by fraud (18 U.S.C. § 2314), and counts seven through fifteen, larceny after trust (22 D.C.Code § 2203). A jury acquitted the appellant on the first six counts but found him guilty on the nine counts charging larceny after trust, in that he fraudulently converted to his own use $1,150,000 entrusted to him by The American Province of the Sisters of the Divine Savior. He was sentenced to imprisonment for not less than three nor more than nine years on each count, the sentences to run concurrently.

I

All of the offenses charged in the indictment were alleged to have occurred in 1963. In that year, and for some

years before, the appellant was a lawyer and real estate man with offices in the District of Columbia. The charges against him had their origin in certain transactions between him and The American Province of the Sisters of the Divine Savior. This organization, a non-profit corporation, was a religious order devoted to nursing, teaching and all forms of charitable work. The projects of the Order were financed by the salaries of the Sisters, by donations, and at times by borrowing of public funds.

The Sisters' public borrowing led to a meeting in May 1962 between the Provincial Superior of the Order, Mother Aquin Gilles, and the appellant. The meeting was arranged by representatives of the Superior Generalate, the Order's parent organization. As a result, the appellant, who was experienced in the financing of religious organizations and was well known to the Superior Generalate, arranged a refinancing of the debts of The American Province. The refinancing was accomplished through a public bond issue underwritten by Keenan & Clarey, a Minneapolis firm specializing in the underwriting of unsecured bonds of religious organizations. The appellant acted as attorney for the Sisters in this matter, but was not compensated for his services. Mother Aquin testified that on one occasion when she mentioned compensation the appellant "said he would not accept any fees", that he "wanted to do this for the Sisters and I never again asked him to remunerate him for his services."

Having arranged refinancing for the Sisters in the fall of 1962 the appellant continued as their legal counsel and financial advisor. They discussed with him a desire to replace or remodel a hospital in Wausau, Wisconsin and a nursing home at Portage which they maintained. This discussion led to a suggestion by the appellant that the necessary funds be obtained through a bond issue, to be arranged through Keenan & Clarey. Mother Aquin testified that on or about May 16, 1963 after many discussions

" * * * I met with Mr. Orsinger, and at that meeting the crystallized form of our proposals were put together and those proposals included taking out a bond issue in the amount of two and a half million dollars of public funds through Keenan and Clarey, and one million dollars of that amount of money would be put in a reserve fund to begin work on Wausau and Portage at such time as we were able to begin and one million and a half was to be entrusted to Victor J. Orsinger for the purpose of assembling a block of property in the Marquette University area on which the Sisters of the Divine Savior would build a house of studies for our young sisters.

\* \* \* \* \* \*

"The proposal was made that it [$1,-500,000] was to be entrusted to Mr. Orsinger through his attorney account and then through that into Parkwood out of which it would be disbursed for the purpose of assembling a block in the Marquette area.

\* \* \* \* \* \*

" * * * the Sisters of the Divine Savior had entrusted, I mean, were entrusting, one and a half million dollars to Victor J. Orsinger on his own word. It was to be paid into his attorney account and then through Parkwood, Incorporated, he would buy this block * * * but we were not giving it to Parkwood as Parkwood. We were giving it, we were entrusting it to Mr. Orsinger for this assembly of the block for us. * * * "

"Parkwood", referred to by Mother Aquin, was Parkwood, Incorporated, a real estate investment and holding company entirely owned by the appellant.

Mother Aquin testified further that in their meeting in May 1963 the appellant advised the Sisters to acquire an entire block rather than the one-third of a block needed for their project, so that "the part not used by the Sisters would not be used then for any purpose incompatible with a house of studies in this area". The appellant estimated that it would take about two years to assemble

the entire block, and according to Mother Aquin he represented that "the Sisters at the end of the two-year period would receive one-third of the block back from Mr. Orsinger, and the $1,500,000 that we had entrusted to him for the purchase of the property", the one-third to be free and clear of all mortgages and encumbrances. The appellant wrote out a summary of his proposal, which included the statement with respect to the disposition of the funds he was to receive: "$1,-500,000 to Victor J. Orsinger for purchase of Marquette Univ. area block, to be secured by mortgage on land purchased. 10% interest for year, i. e., $300,000 for 2 years deposited in escrow in beginning." About a week later, around May 22, 1963, the appellant telephoned Mother Aquin and "suggested that the bond issue be raised to $3,000,000 and that the extra $500,000 would be a temporary loan for a (sic) generalate in Rome, and, that would be repaid for us from a bond issue that the generalate would take out later". The appellant's suggestion was adopted, and the amount of the bond issue was increased to $3,000,000.

Early in June the appellant went to Milwaukee to discuss the proposed bond issue and purchase of land. At this time he asked Mother Aquin "if we would give him a $50,000 advance payment so that he could begin the assembly of the block near Marquette". On June 12, 1963 Mother Aquin sent the appellant her organization's check for $50,000 with a covering letter describing it as "the check of $50,000 as advance payment of money needed for the project in the Marquette area". The check was payable to the order of Victor J. Orsinger, Attorney, and was endorsed by him and deposited in the account of Parkwood, Incorporated. By letter dated June 14, 1963 he acknowledged "receipt of the $50,000 advance payment sent by you today as part of the $1,500,000 required for the Marquette area project." On the same day, June 14, 1963, Orsinger wrote to Mother Olympia, Superior General of the Sisters of the Divine Savior in Rome. Referring to the arrangements for a

$3,000,000 loan and the disposition of the funds raised he said:

"$1,500,000 will go to Orsinger for purchase of land for the Juniorate near Marquette University. Orsinger will pay the entire cost of this bond issue for two years, namely $150,000 a year. The details of our memorandum of May 16, 1963 have not been changed except to raise the amount from $2,-500,000 to $3,000,000.

\* \* \* \* \* \*

"Simply stated, (cf. Memorandum, May 16, 1962), the Sisters will receive the land they need for the Juniorate in Block No. 2, free and clear, at no cost, plus their $1,500,000 back at the end of two years and I would retain the rest of the land in the block."

Noting that $500,000 of the borrowed funds would go to Rome, he added

"You should receive your $500,000 some time around August 1, 1963. Since I am paying the interest costs on this $500,000 also, do you think this $500,000 would take the place of the principal I am supposed to send you in 1963. (Cf. My Memorandum of January 16, 1963.)"

It appeared that the appellant was heavily indebted to the organization in Rome and that substantial payments on his loan were due in 1963.

On June 27, 1963 the Sisters and Orsinger executed a "Memorandum of Agreement" prepared by Orsinger. Mother Aquin signed for the Sisters, and Orsinger signed as "Victor J. Orsinger, Attorney" and "Victor J. Orsinger, President" of Parkwood, Incorporated. The agreement recited that the Sisters "have decided to borrow three million dollars", that "Orsinger, as special legal counsel to the Sisters for this purpose, has assisted the Sisters in arranging this borrowing", that "Parkwood is a real estate corporation, all of whose common stock is owned by Orsinger", and that the agreement was intended to be a "convenient memorandum of the purposes and dispositions of the borrowed funds". The agreement provided for the disbursement of the "$3,000,000 borrow-

ed by the Sisters" at 5% interest, as follows:

"(a) $1,500,000 to Victor J. Orsinger, Attorney, for the purposes described herein;

"(b) $500,000 to the General Council, Sisters of the Divine Savior, Rome, as a temporary loan to be repaid out of 1964 borrowings of the General Council or from other sources;

"(c) $1,000,000 to the Sisters as a reserve fund, which may be reinvested by the Sisters, pending commencement of new building projects in Milwaukee, Wausau, and Portage."

For his part, Orsinger agreed to exert his best efforts and skills "to purchase in his own name or in corporations owned and controlled by him ground" in Milwaukee for the Sisters' Juniorate residence. The agreement further provided:

"For record-keeping and tax-accounting purposes the above-recited $1,500,000 shall be paid to the account of 'Victor J. Orsinger, Attorney', and he shall then disburse it through Parkwood, Incorporated, as required. Therefore, Parkwood, Incorporated, shall issue its promissory note for $1,500,000 due within two years as security for the purposes recited here, which note shall provide for the prompt payment, in semi-annual installments, of interest at the rate of Ten Per Cent (10%) per annum, that is, One Hundred Fifty Thousand Dollars ($150,000) each year while the said note is unpaid and outstanding (so that the total interest charge on the entire Three Million Dollars ($3,000,000) loan shall be paid from the above interest payments made by Parkwood), and further that Parkwood shall reserve such interest in advance by segregating and depositing from its funds the sum of Three Hundred Thousand Dollars ($300,000) in a national bank so that the interest payments will be available when due."

Orsinger also agreed to pay two-thirds of the expenses incident to the placement of the $3,000,000 loan, these expenses being estimated at $111,364 so that Orsinger's share was $74,243. He further agreed that he would charge no legal fee or make any claim for expenses in connection with the placement of the loan or the purchase of the land.[1]

---

1. The full text of the Memorandum of Agreement was as follows:

"Made this 27th day of June, 1963, by and between SISTERS OF THE DIVINE SAVIOR, Milwaukee, Wisconsin (hereinafter called 'Sisters'), and VICTOR J. ORSINGER, 816 Connecticut Avenue, Washington 6, D. C. (hereinafter called 'Orsinger'), and PARKWOOD, INCORPORATED, 816 Connecticut Avenue, Washington 6, D. C. (hereinafter called 'Parkwood')

"WITNESSETH, that

"WHEREAS, the Sisters, acting through their Provincial Council, have decided to borrow Three Million Dollars ($3,000,000), by separate instrument, for those general purposes recited herein, such borrowing being ecclesiastically approved as an unsecured general credit obligation, and

"WHEREAS, Orsinger, as special legal counsel to the Sisters for this purpose, has assisted the Sisters in arranging this borrowing, and

"WHEREAS, Parkwood is a real estate corporation, all of whose common stock is owned by Orsinger, and

"WHEREAS, it is intended, by this writing, to have a convenient memorandum of the purposes and dispositions of the borrowed funds, without affecting hereby the unrestricted power of the Provincial Superior and her Council to modify, change or abandon at any time the purposes and dispositions recited herein; nor does this writing change or affect the Sisters' legal obligation on the separate loan indenture; nor does this writing change or affect any obligations of others, including Orsinger, to the Sisters.

"NOW, THEREFORE, be it remembered that

"1. The $3,000,000 borrowed by the Sisters, through Keenan and Clarey, Inc., Minneapolis, Minn., upon a coupon note issue due September 1, 1968, which issue provides, *inter alia*, payments of interest only in semi-annual installments at the rate of Five Percent (5%) per annum, shall be disbursed as follows:

"(a) $1,500,000 to Victor J. Orsinger, Attorney, for the purposes described herein;

"(b) $500,000 to the General Council, Sisters of the Divine Savior, Rome, as a

temporary loan to be repaid out of 1964 borrowings of the General Council or from other sources;

"(c) $1,000,000 to the Sisters as a reserve fund, which may be reinvested by the Sisters, pending commencement of new building projects in Milwaukee, Wausau, and Portage.

"2. Orsinger agrees to exert his best efforts and skills

"(a) to purchase in his own name or in corporations owned and controlled by him ground (with or without buildings) in one of those certain city blocks in Milwaukee selected by the Sisters for the purpose of assembling a suitable site for a Juniorate residence.

"(b) All such purchases, contracts, mortgages, etc. shall be at the complete risk and liability of Orsinger or his said corporations; and no liability, direct or indirect, shall attach to the Sisters by virtue of this activity, and none shall be inferred from the prospective beneficial interest which the Sisters may receive as a fruit of this activity.

"(c) For record-keeping and tax-accounting purposes the above-recited $1,500,000 shall be paid to the account of 'Victor J. Orsinger, Attorney', and he shall then disburse it through Parkwood, Incorporated, as required. Therefore, Parkwood, Incorporated, shall issue its promissory note for $1,500,000 due within two years as security for the purposes recited here, which note shall provide for the prompt payment, in semi-annual installments, of interest at the rate of Ten Per Cent (10%) per annum, that is, One Hundred Fifty Thousand Dollars ($150,-000) each year while the said note is unpaid and outstanding (so that the total interest charge on the entire Three Million Dollars ($3,000,000) loan shall be paid from the above interest payments made by Parkwood), and further that Parkwood shall reserve such interest in advance by segregating and depositing from its funds the sum of Three Hundred Thousand Dollars ($300,000) in a nation-al bank so that the interest payments will be available when due.

"(d) On or about July 1, 1964, the Sisters and Orsinger shall meet to discuss the progress of the purposes herein intended, and at that time (whether or not such a meeting and discussion are actually held) the Sisters may confirm, alter, amend, modify or completely abandon all or any part of the purposes delegated to Orsinger, without further liability to any parties who may be thereby affected, directly or indirectly, except that any such action by the Sisters shall not relieve Parkwood from its obligation under the exact terms of its $1,500,000 note or otherwise affect the said note unless all of the parties hereto shall agree in writing that the said note shall be modified, renegotiated or cancelled.

"(e) It is recognized that there are certain expenses incurred by the placement of the Sisters' Three Million Dollars ($3,000,000) loan, listed in the underwriting agreement with Keenan & Clarey, Inc., as 'Costs of Making Loan'. These expenses are estimated at $111,364.00. Parkwood hereby agrees to pay two-thirds (⅔) of the actual costs, or approximately $74,243.00.

"(f) Orsinger shall charge no legal fee or make any claim for expenses in connection with the placement of this loan or the accomplishment of the purposes outlined herein.

"(g) If, in the course of accomplishing the above purposes, a building is purchased which is suitable as a temporary residence for the Sisters, Orsinger agrees that possession to such building in its then-present condition shall be delivered to the Sisters and that no rent or other charge shall be made for the use or occupancy of the property; i. e., the Sisters shall pay only the cost of utilities and such repairs or alterations which the Sisters may wish to make to the building.

"IN WITNESS WHEREOF the parties hereto have subscribed to this Memorandum on the day and date first above written.

/s/ Victor J. Orsinger
    Victor J. Orsinger,
    Attorney
PARKWOOD,
  INCORPORATED
/s/ Victor J. Orsinger
    Victor J. Orsinger,
    President

SISTERS OF THE
  DIVINE SAVIOR
/s/ Mother Aquin Gilles"

ATTEST:
/s/ Aubrey A. Arns

ATTEST:

/s/ Sister M. Charline Shakleton

The Sisters' public offering was made on July 1, 1963. On July 3 they transferred $450,000 from their account in Milwaukee to the account of "Victor J. Orsinger, Attorney" in the Maryland National Bank. On July 8 Mother Aquin sent the appellant the Sisters' check for $925,757 drawn to the order of "Mr. Victor J. Orsinger, Attorney". In her covering letter she specified that the money was "to be used for the project in the Marquette area". The total of these two checks, together with the $50,000 "advance" previously sent to the appellant, and $74,243, the appellant's share of expenses of the public offering, is $1,500,000.

In accordance with the agreement of June 27, 1963 that "Parkwood, Incorporated, shall issue its promissory note for $1,500,000 due within two years as security for the purposes recited here" the appellant gave the Sisters Parkwood's note for $1,500,000 signed by him as President. The note, payable on or before two years after its date of July 1, 1963, carried interest at the rate of 10% per year. It provided:

> "The Maker hereof agrees to segregate and deposit from its funds a sum equal to the total interest due on this obligation until maturity and such separate fund, although invested in government bonds or bank time deposits or cash, shall be diminished in proportion to, and only as, the interest payments required by this note are made."

The $1,375,757 received from the Sisters by the appellant and deposited in his attorney account was promptly transferred to the account of Parkwood or one of its wholly-owned subsidiaries. The money was then used to meet various obligations of the appellant and his companies. By the end of August there was only $8,200 in cash left in the "Victor J. Orsinger, Attorney" account and a $3,000 cash balance in the Parkwood accounts. During this period, however, disbursements for the acquisition of the Marquette property amounted to only $12,250. No money was escrowed or segregated for the payment of interest to the Sisters.

The record discloses that when he was dealing with the Sisters in 1963 the appellant and his corporations were in financial difficulties. Payments on loans and mortgages were delinquent and the appellant was struggling without success to obtain additional financing through commercial loans. The proof is that the appellant used the money obtained from the Sisters to meet these pressing obligations. Subsequently, he began the acquisition of the Marquette block with borrowed funds from other sources. By the end of 1963 seventeen properties were under contract out of a total of twenty-one properties in the block. By the end of 1964 twenty properties had been acquired or were under contract. By the end of 1965 the total cost of the property which had been acquired was $1,361,000, including real estate taxes, but the net cash outlay by Parkwood totaled only $410,000. Without telling the Sisters the appellant had mortgaged the property for $890,000; and all except $100,000 of this money was used for the general operations of Parkwood.

In July 1964 officers of the Securities and Exchange Commission went to Milwaukee in connection with an investigation of the sale of church notes which had been sold as a result of an offering prepared by the appellant. At the same time the appellant, as attorney for the Sisters, appeared in Milwaukee to review the progress being made on the acquisition of the Marquette property. The agreement of June 27, 1963 provided for such a review. Mother Aquin testified that at this meeting "Mr. Orsinger presented a modification of agreement, that in view of the fact that all was proceeding as we had expected, that he would like to remove the money that had been kept in escrow to pay the interest as it came due." The modification presented by the appellant provided that the Sisters waive the requirement that interest payments be placed in escrow. Mother Aquin signed the modification agreement and

the appellant signed as president of Parkwood and as "Victor J. Orsinger, Attorney". In fact, as the appellant knew, but did not disclose to Mother Aquin, he had never placed in escrow the money required for the payment of interest.

Mother Aquin did not learn until December 1964 that the appellant had mortgaged the Marquette block. At that time she asked the appellant if there were any mortgages placed on the property and "I was told that there were two mortgages placed on the property there in the amount between $100,000 and $200,000 and this was a very great surprise to me." She testified that the appellant explained "that money had been set aside in a trust company in Milwaukee and that there was no need to worry about the costs the payments would be made on it when they came due." In fact the mortgages exceeded $800,000 and only a small amount had been escrowed for payment.

Although a total of $250,000 in interest was paid to the Sisters through March 31, 1965 they did not receive $1,500,000 on July 1, 1965. Parkwood was placed into insolvency proceedings in March 1966 and into bankruptcy in June 1966. Parkwood defaulted on the loans secured by mortgages on the Marquette block and judgments were obtained by the mortgagee.

## II

The appellant argued in the district court that he was entitled to a judgment of acquittal upon the ground that there was no evidence that the Sisters "entrusted" their money to him "for the purpose of applying the same for the use and benefit" of the Sisters, within the meaning of the statute defining larceny after trust (D.C.Code 1967 § 22–2203). Specifically, the appellant argued that the proof was that he borrowed the $1,500,000 from the Sisters, giving them an interest-bearing promissory note and thereby establishing a relationship of debtor and creditor, rather than one of trust; that as a borrower he had the right to use the money for his own pur-

poses. Cf. Fulton v. United States, 45 App.D.C. 27 (1916). He pointed to the fact that entries in the Sisters' books, and a proof of claim submitted on their behalf in the reorganization proceedings, referred to the note as evidence of an obligation due to the Sisters. The appellant repeats these arguments in this court. The district court was not persuaded and neither are we.

■ Whether a transaction creates a trust relationship or that of debtor and creditor depends upon all of the facts and circumstances, including the intention of the parties. The fact that interest is to be paid is of course evidence that a debt is created as distinguished from a trust obligation, but it is not conclusive. There may be evidence that justifies a jury in finding that notwithstanding the payment of interest the recipient of the money held it in trust. Commonwealth v. Snow, 284 Mass. 426, 187 N.E. 852 (1933); People v. Pierce, 110 Cal.App.2d 598, 243 P.2d 585 (1952); Stecher v. State, 202 Wis. 25, 231 N.W. 168 (1930); McGlynn v. Schultz, 90 N.J.Super. 505, 218 A.2d 408 (1966). Here Mother Aquin, representing the Sisters testified that in her discussions with the appellant he proposed that the Sisters entrust him with $1,500,000 for the purpose of assembling the Marquette block. There was no discussion of a loan or any mention of a loan by Mother Aquin or the appellant; on the contrary it was Mother Aquin's clear understanding and intention that the money was to be entrusted to the appellant for the sole purpose of purchasing land. The appellant asked for a "$50,000 advance payment so that he could begin the assembly of the block" and he acknowledged receipt of this money "as part of the $1,500,000 required for the Marquette area project". On the same day he wrote to the Superior General of the Sisters stating that "$1,500,000 will go to Orsinger for purchase of land for the Juniorate near Marquette University". The "Memorandum of Agreement" executed by the Sisters and the appellant on June 27, 1963 provided that $1,500,000 would go "to Victor J.

Orsinger, Attorney, for the purposes described herein" and that "For record-keeping and tax-accounting purposes the above-recited $1,500,000 shall be paid to the account of 'Victor J. Orsinger, Attorney', and he shall then disburse it through Parkwood, Incorporated, as required". It is plain that the "purposes described" were the purchase of land in the Marquette block, and that the "disbursements required" were disbursements for such purposes, and not for the private purposes of the appellant. Consistently with this interpretation Mother Aquin, when she sent the appellant the Sisters' check for $925,757 on July 8, 1963, specified that the money was "to be used for the project in the Marquette area." Again, the appellant on cross examination admitted that on May 17, 1963, in discussing his application for a loan from the Maryland National Bank, he told a representative of the bank, Mr. Darnielle, that as counsel for the Sisters he was about to receive $1,500,000 from them that this money was for the purchase of certain properties in Milwaukee, that he proposed to place $300,-000 of the money in a certificate of deposit at the Maryland National Bank, and that the balance of $1,200,000 would remain in a checking account, to be gradually disbursed as the properties were assembled in Milwaukee.

The appellant argues that the existence of a promissory note and his payment of interest negative the existence of a trust relationship between him and the Sisters and establish that the relationship was that of debtor and creditor. As we have said the existence of a promissory note and the payment of interest are not conclusive on this point. The jury was required to weigh the significance of the interest-bearing note in the light of all the surrounding facts and circumstances. Among such facts, in addition to those we have already mentioned, was the fact that although the Memorandum of Agreement of June 27, 1963, prepared by the appellant, referred to "borrowing" by the Sisters and to a "temporary loan" of $500,000 to the

General Council, Sisters of the Divine Savior, it said nothing about a loan to the appellant or borrowing by him. If the transaction with the Sisters was a loan the appellant, an experienced lawyer, could have made this plain in the written agreement: indeed, as attorney for the Sisters it was his duty to do so. His failure to do so, coupled with the fact that there was no mention of a loan to him in his discussions with the Sisters, was evidence that there was no loan.

The appellant contends that "simple reasoning" leads to the conclusion that the appellant received a commercial loan from the Sisters, that there is no other credible explanation for the appellant's agreement to pay 10% interest a year on $1,500,000, and to confer other gratuitous benefits upon the Sisters. The jury might have believed from the evidence, however, that the purpose of the appellant's munificence, his offering of something for nothing, was not to make him a borrower but rather to induce the Sisters to part readily with funds which he might juggle for his own purposes. Furthermore, the appellant's statement to Mr. Darnielle of the Maryland National Bank, in May 1963 before he received the Sisters' money, that he proposed to place $300,000 of the money in a certificate of deposit, suggested that he intended to pay them interest with their own money. Again, with respect to the motivation of the appellant's generosity, the jury was entitled to consider the fact that by arranging the public borrowing of $3,000,000 by the Sisters, which included $500,000 for the General Council in Rome, the appellant apparently hoped to relieve the pressure on himself to repay money that he owed to the General Council.

The jury was not bound by the entries in the Sisters' books referring to the appellant's note as an obligation due to the Sisters. The evidence disclosed that these entries resulted from a question to the appellant by Sister Fotina, Treasurer of the Order, who asked the appellant how the note "should be set up on the books". In response the appellant gave

her a memorandum listing the note as a "receivable". Sister Fotina relied upon the appellant's advice in recording the transaction in her books, and this version of the matter carried over into the Sisters' claim in the reorganization proceedings.

In determining the true nature of the transaction between the Sisters and the appellant the jury was also entitled to consider the evidence that when he received the Sisters' money the appellant and his corporations were in straitened if not desperate circumstances. The appellant himself characterized his cash position at the end of May 1963 as a "distress situation". He had attempted without success to obtain financing through commercial loans, so that he might make good on defaults and stave off threatened and imminent foreclosures. In the circumstances any loan to him would have been risky and virtually unsecured. Although he was acting as their attorney and financial advisor he made no disclosure of these facts to the Sisters.

■ If the appellant was to receive the Sisters' money as a loan, then as their lawyer he was bound to make full disclosure to them. It is elementary that the relationship between an attorney and his client, being one of the highest trust and confidence requires the attorney to act in the utmost good faith and candor, to be completely fair and frank with the client, and to take no advantage of the confidence reposed in him. In the light of this legal and ethical compulsion upon him to reveal all material facts if a loan to him was involved in his discussions with the Sisters, the appellant's silence was doubly significant, and was persuasive evidence that no loan was contemplated or made. Moreover, in considering the appellant's conduct after he obtained the Sisters' money, the jury might well have believed that his duplicity and falsifications concerning the escrow fund and the mortgages on the Marquette block were inconsistent with an honest belief on his part that he was

a borrower free to handle the funds as he pleased, and not a trustee for a limited purpose.

■ In summary, we think there was evidence from which the jury could reasonably find that the money received by the appellant was not the proceeds of a loan, but was entrusted to him for a specific purpose, and that his conversion of the funds was larceny after trust. The issue was argued to the jury by able counsel, and the appellant finds no fault with the court's instructions. We see no reason to disturb the jury's finding.

III

■ Other arguments advanced by the appellant require only brief discussion. First, he claims that he secured immunity from prosecution under 15 U.S.C. § 77v(c) because he was subpoenaed by the Securities and Exchange Commission to testify and to produce corporate records of Parkwood and its affiliated corporations. He refused to testify claiming his privilege against self-incrimination, but did produce the corporate records. Since his plea of self-incrimination was honored and he did not give testimony he acquired no immunity. He had no right to refuse to produce the books and records of the corporations. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). Immunity from prosecution under the provisions of 15 U.S.C. § 77v (c) accrues only when a witness invokes his privilege against self-incrimination and is thereafter compelled to testify or to produce his personal records. United States v. Abrams, 357 F.2d 539, 548–549 (2d Cir. 1966), cert. den. 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014; Cf. United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943).

■ The appellant contends also that he was deprived of a fair and speedy trial because a period of some five years elapsed between the dates of the offenses charged against him and the date of the indictment. The record shows, however, that the prosecution of the appellant re-

sulted from an extended investigation into the complicated and tangled affairs of the appellant and his corporations. There is no suggestion of any purposeful or otherwise improper delay in the conduct of the investigation, nor is there any showing of prejudice to the appellant caused by the delay. In these circumstances the appellant's argument must be rejected. Tynan v. United States, 126 U.S.App.D.C. 206, 376 F.2d 761, cert. den. 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967).

We see no basis for reversal in the fact that the District Court gave the standard *Allen* charge Fulwood v. United States, 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. den. 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967).

The judgment is

Affirmed.