In re PROFESSIONAL AIR TRAFFIC
CONTROLLERS ORGANIZATION
(PATCO), Debtor.

AIR TRANSPORT ASSOCIATION OF
AMERICA, Plaintiff,

v.

PROFESSIONAL AIR TRAFFIC CON-
TROLLERS ORGANIZATION
(PATCO), Defendant.

Bankruptcy No. 81–00656.
Adv. No. 82–0069.

United States Bankruptcy Court,
District of Columbia.

Dec. 22, 1982.

Allen Snyder, David A. Kikel, Hogan & Hartson, Washington, D.C., for plaintiff.

Michael R. Lemov, Scott D. Andersen, Leighton, Conklin, Lemov, Jacobs & Buckley, Washington, D.C., for defendant.

## MEMORANDUM OPINION

(Amended Complaint for Declaratory Judgment—to Determine that Certain Monies are Assets of the Debtor's Estate *)

ROGER M. WHELAN, Bankruptcy Judge.

This adversary proceeding, initiated by the Air Transport Association of America (hereinafter referred to as "ATA"), as a creditor of the Professional Air Traffic Controllers Organization (hereinafter referred to as "PATCO"), seeks to determine that certain monies on deposit in an account at National Savings and Trust Company (hereinafter referred to as "NS & T"), which account is referred to in the adversary proceeding as the "Controller's Benefit Fund", constitutes property of the estate pursuant to 11 U.S.C. § 541(a).[1] The defendant, PATCO, as well as the Intervenors, (representing the collective interest of PATCO's Union members) maintain in the filed pleadings that the Controller's Benefit Fund is a trust fund and that in view of the trust nature of this asset, that such a fund is not properly considered property of the estate, but rather belongs to the individual PATCO membership.

As a result of the pleadings filed herein and the evidence presented at trial, the issues raised for this Court's ruling are essentially (1) whether the Controller's Benefit Fund was properly established as a trust, either express or implied, under D.C. law; (2) whether, if the trust was properly created as a trust, the fund thus created was void as contrary to public policy; and (3) finally what should the proper disposition of the Controller's Benefit Fund monies be in the event of a dissolution of the Fund on court decree. This Court concludes after due consideration of all the relevant evidence and after assessing the credibility of the witnesses, that the answer to issues (1) and (2) is in the affirmative; and that the answer to issue (3) is that, based on both legal and equitable principles, the funds should properly vest in the bankruptcy estate.

However, the provisions of 11 U.S.C. § 541(d) further provide that:

"(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
. . . ."

In view of the fact that this Court entered an Order of Conversion to Chapter 7 on July on July 6, 1982, the real party in interest to this proceeding is, of course, the Trustee in bankruptcy, Robert O. Tyler, Esq. However, the Trustee in bankruptcy has expressly acknowledged the coninuation of this litigation by ATA, in view of its impact on the administration of the bankruptcy estate.

---

* In a related proceeding (Adversary Proceeding 81–0308), this Court ruled, on cross-motions for summary judgment filed by the parties therein, that the registration of ATA's judgment in the United States District Court for the District of Columbia and the subsequent attachments issued thereon, were in violation of applicable statutory law and accordingly this Court vacated the judgments and quashed ATA's writs of attachment. *In re Professional Air Traffic Controllers Organization,* Case No. 81–00656, *Air Transport Association of America v. Professional Air Traffic Controllers Organization,* Adv. No. 81–0308, 18 B.R. 894 (Bkrtcy.D.C.1982).

1. 11 U.S.C. § 541(a), in pertinent part, provides that:
"(a) The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located:
(1) Except as otherwise provided in subsection (b) and (c)(2) of this section, all legal and equitable interests of the debtor in property as of the commencement of the case.
. . .".

*Findings of Fact*

The genesis of the Controller's Benefit Fund is found in the actions taken by voting delegates at the 1977 Annual PATCO Convention. Near the end of that convention, the voting membership succeeded in passing a resolution providing for the creation of a National Controller's Benefit Fund, which was to be established from an increase in member dues, and from such dues fifteen (15%) percent of the total withheld dues would be "collected for the Controller's Benefit Fund." Defendant's Exhibit B. Prior to this time, members had, across the country, various area banks which were established and managed by a board of elected trustees. However, these "area banks" were maintained separate and apart from even the local unions and by 1977 there seemed to be a general consensus among the membership that they were inadequate to meet existing member needs. At the conclusion of the 1977 Convention there was amply demonstrated a widespread support for the creation of the Controller Benefit Fund and an appropriate dues increase to initiate it, but because this action took place near the end of the Convention, no by-laws were ever drafted with respect to the actual creation of the Fund. Direct testimony of PATCO witness George Shaw, at Tr. 14–20. Rather, it was the intention of the members and delegates of PATCO to collect the monies and place them in a separate account pending further action. In fact, until the actual creation of the Fund by way of a formal resolution in 1978, the local area banks had the option of withdrawing their pro-rata share from the newly created fund. Throughout the 1977 Convention, as well as during the entire period of the history of the Fund, the Controller's Benefit Fund was frequently and consistently referred to as "the strike fund." In fact, the 1977 Convention minutes reflects this practice:

"When the meeting was reconvened the matter of taking care of the funds for the *strike funds* was discussed at length. There was a wide variance of opinion on whether the funds should be handled at the local level or through the national office but in the name of each particular local where they would have access to their own funds but all the auditing, processing, bonding would be done at the National office where we have the personnel and expertise to do so. Mr. Peer stated that we are not dealing with voluntary contributions but talking about dues. We are not talking about loans, not credit unions, but a *strike fund*."

Defendant's Exhibit C, at 2 of Convention Minutes (emphasis added).

In 1978, at that year's annual convention, a resolution was finally passed that provided for the actual maintenance and operation of the Controller's Benefit Fund at issue.[2]

2. The resolution in pertinent part provides:
ARTICLE I—GENERAL
SECTION 1. THE CONTROLLER SUBSISTENCE FUND SHALL CONSIST OF THOSE MONIES COLLECTED FROM DUES FOR THAT PURPOSE AND ANY INTEREST, DIVIDENDS, PROFITS, OR REPAYMENTS MADE TO THE PATCO CONTROLLER SUBSISTENCE FUND RESULTING FROM BACKPAY AWARDS.
SECTION 2. DURATION: THE FUND SHALL BE PERPETUAL UNLESS DISSOLVED BY MAJORITY VOTE OF THE MEMBERS OF THE FUND. IN CASE OF DISSOLUTION, ALL FINANCIAL OBLIGATIONS OF THE FUND MUST BE PAID PRIOR TO DISBURSEMENT OF THE MONIES.
SECTION 3. OBJECTIVE: TO PROVIDE FINANCIAL SUPPORT OF MEMBERS WHOSE PARTICIPATION IN A NATIONALLY SANCTIONED JOB ACTION HAS RESULTED IN SUSPENSION AND/OR DISMISSAL.
ARTICLE II—RESPONSIBILITY
SECTION 1. THE EXECUTIVE VICE PRESIDENT OF PATCO SHALL BE RESPONSIBLE AND ACCOUNTABLE FOR THE PROPER RECEIPTS AND DISBURSEMENT OF ALL MONIES OF THE FUND, IN ACCORDANCE WITH ARTICLE II, SECTION 4b OF THE PATCO CONSTITUTION. ALL INVESTMENTS OF MONIES IN THE FUND SHALL BE MADE ONLY IN GUARANTEED GOVERNMENT SECURITIES.
SECTION 2. THE NATIONAL FINANCE COMMITTEE SHALL EXERCISE OVERVIEW RESPONSIBILITY OF THE FUND IN ACCORDANCE WITH ARTICLE X, SECTION 1c OF THE PATCO CONSTITUTION.
ARTICLE III—ELIGIBILITY
SECTION 1. IN ORDER TO RECEIVE BENEFITS, A MEMBER MUST:

Although the resolution passed at the 1978 Convention does not provide for the establishment of a formal board of trustees with respect to the maintenance and oversight of the Fund, the uncontradicted testimony of PATCO members and officials clearly manifests an intention to include the basic provisions of a contemporaneous Boston Resolution, which had the support of most Union members at that Convention.[3] In fact, it was the intention of the membership basically to adopt the Boston Resolution and during a heated floor debate, Robert Poli argued in opposition to the adoption of the exact language of the Boston Resolution and stated that the Executive Resolution would essentially meet all of the demands of the membership for a trustee. William Taylor testified as follows:

"Q Think back now. What was your understanding as voting representative with respect to the role and responsibility of the executive vice president in the passed resolution?"

"A That he be the caretaker of the funds, he would insure that they were collected and secured, and that he would report on those to us, and generally maintain the finances for us in Washington."

"Q What about the use of the money, what could he do with the money?"

"A Only what was described in the general statement of Article I of the by-laws, and that was for the subsistence payment for anyone who was suspended or dismissed."

. . . . .

A. BE A MEMBER AS DESCRIBED IN THE PATCO CONSTITUTION, ARTICLE VI.
B. *BE SUSPENDED AND/OR DISMISSED AS A DIRECT RESULT OF HIS (HER) PARTICIPATION IN A NATIONALLY SANCTIONED JOB ACTION.*
C. HAVE BEEN AN ACTIVE MEMBER OF PATCO FOR 180 DAYS IMMEDIATELY PRIOR TO APPLICATION FOR BENEFITS. THE 180–DAY LIMITATION DOES NOT APPLY TO NEW MEMBERS WHO HAVE BEEN EMPLOYED AS AIR TRAFFIC CONTROLLERS FOR LESS THAN ONE YEAR.
D. FILE A GRIEVANCE OR ADMINISTRATIVE APPEAL AGAINST THE SUSPENSION/DISMISSAL.
E. BE CERTIFIED AS ELIGIBLE BY HIS (HER) LOCAL EXECUTIVE BOARD. IF NO

"Q Now, I think you testified that there was a conscious decision to substitute Article II of the passed resolution, Article III of the passed resolution dealing with the responsibility[,] for Article II of the Boston resolution dealing with trustees?"

"A That is correct."

"Q Now, I am going to ask you some questions about the conscious decision. Was the conscious decision relating to the wording or the underlying meaning of the substitution?"

"A To the wording."

"Q Tell me about the underlying meaning."

"A The meaning was the same. What we were concerned about was the board of trustees that was elected from the field that would have to travel to Washington and meet twice a year, to the effect that we would have to pay more out of the fund for the coverage of those things that we would become indebted to, that there was already a financial committee elected and performing the same essential duties."

"Q Did I hear you say the meaning was the same?"

"A Exactly the same."

"Q The same as what?"

"A As the board of trustees under the Boston resolution."

. . . . .

"Q . . . Were you there [on the floor of the Convention] when it happened?"

LOCAL EXECUTIVE BOARD EXISTS, THE MEMBER MUST BE CERTIFIED BY THE REGIONAL VICE–PRESIDENT.
F. DELIVER A PROMISSORY NOTE TO THE BOARD OF TRUSTEES PROMISING TO REPAY THE FUND FOR BENEFITS RECEIVED IN AN AMOUNT EQUAL TO ALL BACKPAY AWARDS RESULTING FROM GRIEVANCE, APPEAL, OR COURT ACTION, IF ANY.
Defendant's Exhibit A, at 1, (Emphasis added).

3. It should be noted at this point that the most important language of the Boston Resolution for consideration here was the specific provision for a board of trustees.

"A Very much so. It was afterwards. In fact, the whole convention stopped on it. It was confusion. It was a crazy time in the convention, nobody knew what happened.

"And that is why we voted against it. We did stop the proceedings finally. Poli came down to the floor, and the first person he talked to was me. I asked him what the hell are you doing with this thing? He said, we compromised with Boston, we can live with Boston language, you have got everything you guys wanted."

Redirect testimony of PATCO witness, *William Taylor,* at Tr. 53–56. The overwhelming intention of the Union members, as demonstrated by the various convention statements and meetings, was to segregate the Controller's Benefit Fund and to maintain it separate and apart from PATCO's union structure. Although no "trustees", as such were formally designated, it is clear from this intent of both the members and the officials, that the Executive Vice President would, in fact, function as a "trustee" of the fund.[4] The Fund, moreover, was maintained by the Executive Vice President separate and apart from union assets and was specifically treated as a segregated item on the balance sheet as well as on all financial reports of the Union. *See* Defendant's Exhibit LLL and Plaintiff's Exhibits 13–18. The Controller's Benefit Fund was consistently carried as a "reserve" in the Union's financial statements (*See* for example, Defendant's Exhibit BBB) and the Union dues allocated to the Fund (15% of the 1.5% dues check-off) were never reported as income to the Union.[5] Moreover, throughout the duration of this trust fund, no payments were ever effected except to the three members noted.[6]

At the same time Convention minutes (Defendant's Exhibit C) clearly reflect the underlying intention of the Union and its membership with respect to the actual nature of the Fund created—the Fund was consistently and frequently referred to as a "strike fund," a reference repeated in the minutes on numerous occasions:

"Mr. Peer stated that we are not dealing with voluntary contributions but talking about dues. We are not talking about loans, not credit unions, but a *strike fund.*"

Defendant's Exhibit C at 2 of Convention Minutes (Emphasis added). Although the language used to authorize the withdrawal of benefits limits the payment of benefits to members who are suspended and/or dismissed as a result of a "nationally sanctioned job action," the Court finds that the intention of the Union was to create a fund that would provide financial benefits to those members who either engaged in a strike or other action, such as a slowdown, prohibited by law. This inference is manifest from the actions of the Union members: their continual reference to the fund as a strike fund; the maintenance of the fund itself, (throughout its duration, only minimal benefits were ever paid out to three members for particular sanctioned job actions); the testimony of Robert Poli (Plaintiff's Exhibit 49) before a Congressional Subcommittee wherein Poli refers to

**4.** Article II of the 1978 Resolution, as passed, designates the Executive Vice President of PATCO as the responsible individual for receipt and disbursement of all monies of the fund. Section 1 of Article II further governs the manner of investment, and Section 2 places overview responsibility in the hands of the National Finance Committee. See "Article II—Responsibility," at n. 2, *supra.*

**5.** After extensive testimony from several accounting witnesses, this Court is fully satisfied that the Fund, although carried as an asset, was correctly reported as an "off-setting" reserve. The expert testimony of Donald Seay is probative of the correct accounting procedure insofar as the strike fund was properly claimed to be a trust and reported as such. Furthermore, the accounting principles behind the reporting of such a fund as a separate reserve were further corroborated by Mr. Babitz as the Union's regular accountant.

**6.** Although the Union itself did not timely transmit the required 15% of the checked-off union dues to the Controller's Benefit Fund, and in fact apparently used this delay in transmittal to its benefit, there is no evidence of commingling of funds in the traditional sense of that term.

the fund as a strike-fund[7] and the fact that, pursuant to the very language creating the Fund, benefits could now properly be paid to striking members of the Union. (*See* Direct testimony of Dominic Torchia, at Tr. 96).

Although as noted above, no unauthorized disbursements were ever made from the strike fund, the Plaintiff argues that the maintenance of the Fund was contrary to established trust practices and that this unorthodox maintenance is a further indication that the Fund was not in fact a trust fund. The only supportive evidence of this contention adduced by the Plaintiff is the fact that at one time, the trust fund was pledged as collateral for a line of credit to the Union itself. The evidence clearly indicates that the Fund was so pledged, albeit for only a very short period of time. However, the financial documentation indicates that the Fund was reported as a separate *reserve* fund and was interpreted as such by the creditor, NS & T.[8]

## Conclusions of Law
### (Controller's Benefit Fund as an Express Trust)

The overwhelming evidence of record adduced by the Defendant satisfies this Court that the Controller's Benefit Fund was created as a trust and essentially maintained as such during its lifetime. An express trust, under the law of the District of Columbia,[9] as well as under the *Restatement of Trusts,* has been defined as:

"[A] fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person which arises as a result of the manifestation of an intention to create it."

*Restatement (Second) of Trusts,* § 2 (1959).

In order properly to determine whether a given transaction results in the creation of a trust, the Court is required to consider all relevant facts, including the intention of

7. Robert Poli offered the following testimony at hearings before the Subcommittee on Investigations of the Committee on Post Office and Civil Service, of the House of Representatives (September 30, 1980):

"Mrs. Spellman. At this time, of course, there is a question as to whether there will be a strike. You have indicated that there won't be. You have also testified on several occasions that the PATCO strike fund is not meant for current use.

"Mr. Poli. That is correct.

"Mrs. Spellman. You have said that the fund is to be saved for such time as Federal employees are guaranteed the right to strike.

"Are you saying, then, that if some or all of your members should strike next March, not 1 cent of that fund would be used to assist those strikers?

"Mr. Poli. That is correct. The strike fund itself has been discussed and debated before the Federal labor relations authority. The charge that was leveled this morning that we had the answer to, they have made a statement, we did not even have to go to a hearing, that we were allowed to have that fund in the event that the legislation passes that grants us the right to strike.

"If that situation arose, we would have to make a decision at that time, but under the bylaws of the plan itself, it would be illegal if there was some sort of illegal action at that time that took place."

Plaintiff's Exhibit 49, at 21–22.

Notwithstanding Mr. Poli's testimony before the House, this Court is convinced that although the Fund benefits would be made available for strikes that might be sanctioned only if Congress were to pass a law to that effect, those funds would be equally available for any member who would be dismissed or suspended as a result of an illegal strike—the very situation now confronting the Court in this proceeding.

8. This pledging of the asset by PATCO to secure a $200,000 line of credit with NS & T is, of course, inconsistent with the nature of a trust fund. However, in connection with the overall transaction, the account itself is clearly identified as a restricted fund. Direct testimony of PATCO witness R. Paul Hammond, at Tr. 129. While this pledge of the Fund as collateral may raise serious questions concerning the management of the trust by the trustee, this Court is satisfied that the account maintained its separate trust existence during this period.

9. There is no disagreement with reference to the application of District of Columbia law to the creation and the maintenance of the subject trust. The Fund was created in the District of Columbia, maintained and administered from D.C., and was held in trust for the members of the National Organization, which of course, was based in D.C. The Fund should thus be construed under District of Columbia law.

the parties. *U.S. v. Orsinger,* 428 F.2d 1105 (D.C.Cir.1970). The evidence adduced by the defendants clearly establishes an intention to create a fund separate and distinct from PATCO assets and provide for the continued maintenance of that fund through the requirements clearly set forth in the approved bylaws. While there is no designation of a "trustee" in specific language as such, the language employed in the bylaws and the underlying resolution clearly manifests an intent that the establishment and handling of the Fund be vested in the Executive Vice President. The background concerning the creation of the Fund, as testified to by such witnesses as Robert Poli, William Taylor and Paul Cannon, amply demonstrate that the ultimate language of Article II was in effect a transposition of the trustee language set forth in the Boston Resolution. The Plaintiff's argument and evidence focus on the fact that there is no *specific* reference to a trustee in the bylaws and that the monies in the Fund were to be handled in the same way as other PATCO assets. The Court, however, is satisfied after considering all of the evidence in context and assessing the credibility of the witnesses that the members expected and intended to have their funds specifically segregated and set apart for special purposes as designated in the bylaws; namely,

ARTICLE I—GENERAL

SECTION 1. THE CONTROLLER SUBSISTENCE FUND SHALL CONSIST OF THOSE MONIES COLLECTED FROM DUES FOR THAT PURPOSE AND ANY INTEREST, DIVIDENDS, PROFITS, OR REPAYMENTS MADE TO THE PATCO CONTROLLER SUBSISTENCE FUND RESULTING FROM BACKPAY AWARDS.

SECTION 2. DURATION: THE FUND SHALL BE PERPETUAL UNLESS DISSOLVED BY MAJORITY VOTE OF THE MEMBERS OF THE FUND. IN CASE OF DISSOLUTION, ALL FINANCIAL OBLIGATIONS OF THE FUND MUST BE PAID PRIOR TO DISBURSEMENT OF THE MONIES.

SECTION 3. OBJECTIVE: TO PROVIDE FINANCIAL SUPPORT OF MEMBERS WHOSE PARTICIPATION IN A NATIONALLY SANCTIONED JOB ACTION HAS RESULTED IN SUSPENSION AND/OR DISMISSAL.

ARTICLE II—RESPONSIBILITY

SECTION 1. THE EXECUTIVE VICE PRESIDENT OF PATCO SHALL BE RESPONSIBLE AND ACCOUNTABLE FOR THE PROPER RECEIPTS AND DISBURSEMENT OF ALL MONIES OF THE FUND, IN ACCORDANCE WITH ARTICLE II, SECTION 4b OF THE PATCO CONSTITUTION. ALL INVESTMENTS OF MONIES IN THE FUND SHALL BE MADE ONLY IN GUARANTEED GOVERNMENT SECURITIES.

SECTION 2. THE NATIONAL FINANCE COMMITTEE SHALL EXERCISE OVERVIEW RESPONSIBILITY OF THE FUND IN ACCORDANCE WITH ARTICLE X, SECTION 1c OF THE PATCO CONSTITUTION.

The steps taken[10] in order to insure such segregation were consistent with this intent and from its inception the Fund was specifically carried as a segregated reserve fund in all of PATCO's financial statements. Certainly, the mere fact that the terms "trust" or "trustee" were not specifically employed in the actual drafting of the resolution and bylaw is not dispositive of the issue, as the circumstances surrounding the drafting and the passing of the resolution during the heat of the '77 Convention must be weighed under the particular facts of this case. *International Harvester Compa-*

10. While it clearly would have been preferable to provide for a direct transmission of the dues to the Controller's Benefit Fund as testified to by the Plaintiff's witness, David Duran, in order to avoid the very problems that did arise in this case with respect to the unjustifiably long delays in remitting the required percentage amount to the Controller's Benefit Fund, the actual steps employed by PATCO members and the Union are not per se inconsistent with the expressed goals and objectives of the Union membership in establishing a separate fund which was to be created from the check-off of union dues.

*ny v. United States,* 342 F.2d 432, 437, 169 Ct.Cl. 821, (1965); *Lucianna v. Hip Sing Association,* 256 A.2d 898 (D.C.App.1969); *Brown v. Christman,* 126 F.2d 625 (D.C.Cir. 1942).

Finally, although argument has been made and the evidence adduced by the Plaintiff that the Fund was never maintained as a trust in accordance with established law,[11] the overwhelming and largely uncontradicted evidence of record establishes that, while there were unexplained and lengthy delays in the transmittal of monies to the Fund, there was no commingling of funds once the funds in fact were transmitted. In addition, the uncontradicted evidence clearly establishes that there were no unauthorized disbursements ever made once the funds were deposited. Moreover, the pledging of the Fund in connection with the securing of a $200,000 line of credit with NS & T, while apparently inconsistent with established fiduciary duties, was done with knowledge on the part of the lending institution that this asset was not in fact an asset of PATCO nor was it ever treated as such on the financial statements submitted to NS & T in seeking approval for the line of credit. In fact, as explained by the bank's officer, a hypothecation agreement was used which is customary in connection with the pledging of an asset that does not belong to the borrower.

In conclusion, the evidence of record in substance reflects an express intention on the part of PATCO and its members to create a separate and distinct reserve for specific purposes as reflected by the stated objectives in Article I, Section 3 of the bylaws. *See* n. 2, *supra.* Furthermore, as the evidence reflects, and as required by established legal principles, the Fund was appropriately created as a trust and despite the deviations already noted, was essentially maintained as a trust fund. This is par-

ticularly relevant in connection with the continued reporting of this Fund as a reserve in PATCO's financial statements, and in disclosure statements required as a Union, as evidenced by Defendant's Exhibits TT, UU, VV, WW.

*The Controllers Benefit Fund, as a Trust Fund, Was Established Contrary to Public Policy in View of its Objectives*

While this Court is satisfied that the requisite intent existed with reference to the creation of the Controller's Benefit Fund as a trust fund, the Court is equally satisfied that the evidence adduced by the Plaintiff is clear and convincing as to the true objectives of the Union membership with reference to the establishment of this Fund. Based on a complete review of the testimony and after assessing the credibility of witnesses, both on the part of the Plaintiff and Defendant, it is clear to the Court that the primary objective of the membership was to create a source of future benefits in the event of a nationwide strike that was in turn, sanctioned by the bylaws. While the language employed with reference to the stated objectives, namely:

"SECTION 3. OBJECTIVE: TO PROVIDE FINANCIAL SUPPORT OF MEMBERS WHOSE PARTICIPATION IN A NATIONALLY SANCTIONED JOB ACTION HAS RESULTED IN SUSPENSION AND/OR DISMISSAL."

Defendant's Exhibit A, at 1. is admittedly ambiguous, the clear import of the objectives of the Fund must be construed with reference to both the creation and maintenance of that Fund. It is the Court's opinion that the continual reference to this Fund as a strike fund is but one basis for determining the intent of the membership.

It is important to consider as background to the language actually employed in Article I, Section 3, the statutory prohibition against striking.[12]

---

11. Plaintiffs' argument is essentially predicated on two major digressions that occur during the maintenance of the trust fund in question; namely, the long period of time (for as long as 4 to 5 months, in some cases) in which the allocated percentage due the Controller's Benefit Fund was not timely transmitted, and the

pledging of the Fund in connection with the securing of a line of credit with a local banking institution.

12. "(b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization—

From the very inception of the Fund in 1977 [13] and during the Convention meetings in which the Fund was actively discussed and debated, there is a clear and consistent reference to the fund as a "strike fund." While the mere reference to the Fund as a strike fund is hardly controlling in and of itself, the actions taken with reference to the creation and maintenance of the Fund are certainly more convincing when taken in context. Article I, Section 3 of the by-laws clearly provides that benefits will be provided to only those members who are "suspended and/or dismissed as a direct result of (his/her) participation in a nationally sanctioned job action". Defendant's Exhibit A, at 1. Robert Poli, in his testimony before a congressional subcommittee, told that committee that the Fund was envisioned as a strike fund but only after Congress changed the law so as to permit strikes. In view of the language employed in Article I, and now taken in perspective,

. . . . .

"(7)(A) to call, or participate in, a strike work *stoppage or slowdown, or picketing of* an agency in a labor-management dispute if such picketing interferes with an agency's operations, or

"(B) to condone any activity described in subparagraph (A) of this paragraph by failing to take action to prevent or stop such activity;

. . ."

5 U.S.C. § 7116(b)(7)(A) and (B) (1978); *See also,* 18 U.S.C. § 1918 (1966); the District Court for the Eastern District of New York entered a permanent injunction against unlawful job actions engaged in by PATCO in *ATA v. PATCO,* 453 F.Supp. 1287 (E.D.N.Y.), *aff'd,* 594 F.2d 851 (2d Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979):

" 'PATCO, its officers, agents, employees and members, its successors or assigns, and any other person acting in concert with it or them, is permanently prohibited and enjoined from, in any manner, calling, causing, authorizing, encouraging, inducing, continuing or engaging in any strike (including any concerted stoppage, slowdown, or refusal to report to work) by air traffic controllers employed by an agency of the United States, or any other concerted, unlawful interference with or obstruction to the movement or operation of aircraft or orderly operation of any air traffic control facilities by any agency of the United States.' "

453 F.Supp. at 1290 (from Stipulation entered into by the parties on September 9, 1970).

the Fund was clearly envisioned as a means of providing benefits to striking members and is consistent with the expressed intent noted by Mr. Peer as then counsel for the Union. In fact, Defendant Torchia, the then-existing Trustee of the Fund, clearly acknowledged that it would be consistent with the stated language of the bylaws at issue, to provide benefits to PATCO's existing members who engaged in the now-historic strike of August 3, 1981. It is clear that the criteria in governing the triggering of benefits from the Controller's Benefit Fund provided a financial incentive to its members to engage in an illegal act—in this case, the national strike called by PATCO on August 3, 1981. It is likewise just as evident that the objectives of the Fund are manifestly contrary to expressed public policy. While PATCO argues that the Federal Labor Relations Authority (the "FLRA") expressly held in its June 25 1980 opinion letter (Defendant's Exhibit R) [14] that the

**13.** It was clear not only from the common reference to the Fund as a strike fund but from the *Minutes themselves introduced by the Defendants as Exhibit C* that the Fund was commonly considered to be specifically a fund for use in the event of a strike:

"When the meeting was reconvened the matter of taking care of the funds for the *strike fund* was discussed at length. There was a wide variance of opinion on whether the funds should be handled at the local level or through the national office but in the name of each particular local where they would have access to their own funds but all auditing, processing, bonding would be done at the National office where we have the personnel and expertise to do so. Mr. Peer stated that we are not dealing with voluntary contributions but talking about dues. We are not talking about loans, not credit unions, but a *strike fund."*

Defendant's Exhibit C, at 2 of Convention Minutes (Emphasis added).

**14.** "In my view the prohibitions of Section 19(b)(4) apply to actually calling or engaging in an illegal job action as opposed to implementing a fund which may or may not be used in the future to support such an action. Nor does the establishment of such a fund amount to condonation by the labor organization of action proscribed in Section 19(b)(4). Thus, the mere existence of the Fund does not constitute a reasonable basis for a Section 19(b)(4) violation."

Defendant's Exhibit R, at 2.

existence of the Fund was in no way an unfair labor practice, a careful reading of the opinion letter concentrates on the "mere existence" of the Fund and not its eventual use in connection with prohibited job actions that are contrary to established law. Here, the use of the Fund, to support an illegal strike, would provide financial remuneration to the members of a union that has now been finally de-certified. *PATCO v. Federal Labor Relations Authority*, 685 F. 547 (D.C.Cir.1982). Simply put ". . . where circumstances of a statutory prohibition or the defeating of a public policy in the object of a trust, the trust is void and of no effect." 76 Am.Jur.2d *Trusts* § 20 (1964). Moreover, the *Restatement (Second) of Trusts* dictates that:

> A trust may be invalid on the ground that it tends to induce a breach of the criminal law, although the performance of the trust does not involve the commission of a criminal or tortious act by the trustee. Thus, if a group of persons is engaged in the commission of criminal acts, a trust to pay the fines of any of them who may be convicted of committing such acts is invalid. The payment of fines is not illegal; but the purpose of imposing fines is to deter persons from committing criminal acts, and the enforcement of a trust to pay the fines would destroy the deterrent effect of imposing fines, and would tend to induce the beneficiaries of the trust to commit such acts.

*Restatement (Second) of Trusts*, § 62 Comment b (1959)

It is clear to the Court that recognition of the trust fund, created as it was to thwart a clear and express public policy against strikes by government employees, would result in a perversion of valid stated government objectives in defining union activities. Accordingly, the trust fund should not be recognized and the disposal of the funds should be directed according to established precedent.

### The Monies in the Controller's Benefit Fund are Properly Property of the Estate to be Administered by the Trustee in Bankruptcy

Where a trust fails due to the illegality of the trust, the general rule is that a resulting trust arises in favor of the donor. *Restatement (Second) of Trusts*, § 411; *see also* 76 Am.Jur.2d *Trusts* § 203 (1964). With respect to this well-established principle of law, the Union and the Intervenors argue that the monies should properly vest in the members who contributed to the Fund, as PATCO was never intended to be the settlor or donor of the trust at issue. *See* Defendant's Post-Trial Brief, at 14. Whether the donor is deemed to be PATCO, or its individual members, the Court is of the firm opinion that the ultimate disposition of the trust should be vested in the bankruptcy estate based on established equitable principles.[15] Just as a trust, when created, is subject to equitable principles and can, therefore, not be created to effectuate a purpose which is illegal or contrary to public policy,[16] so too, the disposition of those trust funds should be subject to well-established equitable principles. Appropriately set forth as a matter of general principle in *United States v. Haddock*, 144 F.Supp. 720, 725 (E.D.N.C.1956) is the place of such principles when a fraud has been perpetrated, citing Perry on Trusts (5th ed.) § 170:

> "although courts of equity have not made general definitions stating what is fraud and what is not, they have not hesitated

---

**15.** Based on the evidence adduced by the Plaintiff, there is certainly ample evidence to support the legal position of ATA that PATCO is in fact the donor of the trust in view of the way that dues were remitted to the Union in accordance with the established check-off system. In turn, the monies transmitted to the Fund came from the Union itself. In other words, the dues were remitted to PATCO and PATCO in turn remitted the required 1.5% to the Controller's Benefit Fund. Plaintiff's Post-Trial Memorandum, Part 2. Furthermore, there is no provision within the bylaws or the underlying resolution providing for the ultimate disposition of these funds. In any event, the only rebate that could have been made, based on the evidence of record, was a rebate to the then-existing area banks.

**16.** *See* 89 C.J.S. *Trusts* § 78 (1955)

to lay down broad and comprehensive principles of remedial justice, and to apply these principles in favor of innocent parties suffering from the fraud of others. These principles, though firm and inflexible, are yet so plastic that they can be applied to every case of fraud as it occurs, however new it may be in its circumstances. The leading principle of this remedial justice is by way of equitable construction to convert the fraudulent holder of the property into a trustee, and to preserve the property itself as a fund for the purpose of recompense."

To permit the return of the trust monies to members of the Union that have acted in clear defiance of established law would be to reward PATCO members for their illegal action. In weighing the equities between the individual members and the creditors of PATCO, it is clear that the monies in the Fund should vest in the bankruptcy estate. A deliberate choice was made by the Union membership to violate the law, which decision is now clearly binding on its members,[17] and now to reward these union members by permitting them to reclaim the fund would be to aid them in their illegal conduct, and would in this Court's opinion result in a gross miscarriage of justice. To create a trust fund which was to be a future repository of financial security for the Union members who engaged in illegal and prohibited activity, and now, in particular, a nationwide illegal strike, calls to mind the words of King John in Shakespeare's immortal play "King Henry VIII":

> "How oft the sight of means to do ill deeds makes ill deeds done!"

King Henry VIII, Chapter 3, Ibid. 219.

■ Clearly, as a court of equity, the Court can properly direct the disposition of funds based on the established beneficial interest therein. *See Garvey v. Parrish,* 84 Ill.App.3d 578, 40 Ill.Dec. 13, 405 N.E.2d 1105 (1980); similarly, there is ample prece-

dent for this Court or any court, upon failure of an expressed illegal trust, to deny relief to a settlor or donor of a trust, on the theory of a resulting trust. *Fisher v. Keeler,* 142 Neb. 728, 7 N.W.2d 659 (1943); *Smart v. Baroni,* 360 Pa. 296, 61 A.2d 860, 861 (1948). Likewise, if a suit is brought by the ceste qui trust of an illegal trust, and to grant enforcement would advance the accomplishment of the unlawful objectives of the settlor, it is clear that equity may refuse relief on the well-recognized clean-hands doctrine. *See Pace v. Wainwright,* 243 Ala. 501, 10 So.2d 755 (1942); *Murphy v. Murphy,* 308 Ky. 194, 213 S.W.2nd 601 (Ct. App.Ky.1948); and *In re Xydias' Estate,* 92 Cal.App.2d 857, 208 P.2d 378 (1949). It is clear that the application of the well-known clean-hands doctrine is properly applied to the facts of this case in order to discourage similar activity which is deemed to be contrary to well-established public policy.

For the reasons set forth in this memorandum opinion, the Court will enter an appropriate judgment for the Plaintiffs and will direct that all funds on deposit, together with accrued interest, shall be deemed vested in the Trustee in Bankruptcy as property of the estate pursuant to Section 541(a) of the Bankruptcy Code.

A separate order shall be entered in accordance with the requirements of Bankruptcy Rule 921.

---

**17.** The necessary element for the payment of benefits is triggered whenever there is a "nationally-sanctioned job action" as provided for in Article I, Section 3 of the bylaws. This was clearly intended to cover action that was sanctioned on a nationwide basis for all PATCO members.