Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 12, 2003      Decided November 14, 2003

No. 02-7100

KINGMAN PARK CIVIC ASSOCIATION AND
CHEVY CHASE CIVIC ASSOCIATION,
APPELLANTS

v.

ANTHONY A. WILLIAMS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv02675)

———

*Frazer Walton, Jr.* argued the cause for appellants. With him on the briefs was *Steven W. Teppler*.

*John R. Hoellen*, Assistant General Counsel, argued the cause for appellee Council of the District of Columbia. With him on the brief were *Charlotte Brookins-Hudson*, General Counsel, and *Katherine Westcott*, Assistant General Counsel.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Brian K. Flowers*, Assistant General Counsel, entered an appearance.

*Michael F. Wasserman*, Assistant Corporation Counsel, argued the cause for appellee Mayor Anthony A. Williams. With him on the brief was *Charles L. Reischel*, Deputy Corporation Counsel at the time the brief was filed. *Donna M. Murasky*, Senior Litigation Counsel, and *Edward E. Schwab*, Assistant Corporation Counsel, entered appearances.

Before: EDWARDS, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: This appeal involves a challenge to the Ward Redistricting Amendment Act of 2001 (the "Ward Redistricting Act" or the "Act"), which redrew the boundaries of the District of Columbia's eight electoral wards following the 2000 census. *See* D.C. CODE § 1-1041.03 (Supp. 2003). Shortly before the new ward boundaries took effect, appellants Kingman Park Civic Association ("KPCA") and Chevy Chase Civic Association ("CCCA") brought suit in the District Court against D.C. Mayor Anthony Williams ("the Mayor") in his official capacity and the members of the D.C. Council ("the Council") in their official capacities, seeking declaratory and injunctive relief. Appellants claimed that the Act dilutes African-American voting strength in Ward Six and citywide in violation of § 2 of the Voting Rights Act of 1965 ("Voting Rights Act"), 42 U.S.C. § 1973 (2003), and violates various provisions of D.C. law governing ward redistricting.

The Mayor and the Council moved separately to dismiss, or in the alternative, for summary judgment. The District Court first dismissed the complaint against the Council, holding that they are entitled to legislative immunity from suit in connection with their "legitimate legislative activity" in drafting and adopting the Act. The court then dismissed the Voting Rights Act counts of the complaint against the Mayor for failure to state a claim, and dismissed the pendent D.C. law claims pursuant to 28 U.S.C. § 1367. Appellants challenge these rulings on appeal, renewing their Voting Rights Act and D.C. law claims solely as to Wards Three and Six and

alleging, for the first time, that the Act racially gerrymanders ward boundaries in violation of the Fourteenth and Fifteenth Amendments.

We affirm the judgment of the District Court. We do so, however, on different grounds than those relied on by the District Court. We hold that, although it was error for the District Court to dismiss the Voting Rights Act counts of the complaint for failure to state a claim, the Mayor is nonetheless entitled to summary judgment on those counts on the record before us. Appellants have made no showing that minority voters in the relevant wards are politically cohesive or that the wards are characterized by racially polarized voting. They therefore fail to establish a triable issue as to at least two of the three conditions essential to a prima facie case of vote dilution under § 2. We decline to reach appellants' Fourteenth and Fifteenth Amendment claims, which were not raised before the District Court and were therefore waived. Having resolved the federal claims in the Mayor's favor, we affirm the District Court's dismissal of the pendent D.C. law claims against him. Finally, we dismiss appellants' claims against the Council for lack of a substantial federal question. It is undisputed that appellants' federal claims against the Mayor and the Council are identical. The merits of these claims having been resolved dispositively against appellants, there remains no federal question requiring decision. We therefore dismiss the suit against the Council without addressing their assertion of legislative immunity.

## I. Background

The District of Columbia is governed in part by a popularly elected mayor and a popularly elected Council, the latter being composed of five members elected at large and eight members elected from single-member wards. *See* D.C. Code §§ 1-204.01 *et seq.*, 1-204.21 *et seq.* (2001). D.C. law requires that the Council, by act after public hearing, adjust the boundaries of the city's eight electoral wards as necessary following each decennial census. D.C. Code § 1-1011.01(a), (b) (2001). The resulting wards must be compact, contiguous,

and approximately equal in population, and must conform to the greatest extent possible to census tract boundaries. *See* D.C. CODE § 1-1011.01(c), (e) (2001). The population of each ward must be within five percent of the mean ward population, "unless the deviation results from the limitations of census geography or from promotion of a rational public policy, including but not limited to respect for the political geography of the District, the natural geography of the District, neighborhood cohesiveness, or the development of compact and contiguous districts." D.C. CODE § 1-1011.01(f) (2001). D.C. law prohibits the adoption of any redistricting plan or amendment to a redistricting plan with the "purpose and effect of diluting the voting strength of minority citizens." D.C. CODE § 1-1001.01(g) (2001).

The 2000 census results revealed a marked disproportion in the population of the District's eight electoral wards, attributable to population growth in the western wards (Wards One, Two, and Three) and a corresponding decline in the population of the eastern wards (Wards Four, Five, Six, Seven, and Eight). *See* Compl. for Declaratory J. Ex. 8 (map based on U.S. Census Bureau data showing population changes from 1990 to 2000); *see also* District of Columbia Population by Single Race and Hispanic Origin by Ward-2000 (prepared by the D.C. Office of Planning/State Data Center from U.S. Census Bureau data) (hereinafter "Pre-Redistricting Ward Population By Race"), *reprinted in* Joint Appendix ("J.A.") C (First Am. Compl. App. 10).

In June of 2001, the Council adopted and the Mayor signed the Ward Redistricting Act, which adjusted the District's ward boundaries in light of the census results. After review by both houses of the U.S. Congress, the Act became law on October 2, 2001, and the ward boundary changes took effect on January 1, 2002. *See* D.C. CODE § 1-1041.03 (Supp. 2003) (legislative history). The Act adjusted ward boundaries to bring the population of every ward to within five percent or less of the mean ward population. *See* June 19, 2001 Final Redistricting Summary Table, *reprinted in* J.A. C (First Am. Compl. App. 5). In so doing, the Act transferred several neighborhoods or portions of neighborhoods from one ward to

another and altered the racial composition of several wards. *See* Sewell Chan, *Proposed Lines Divide D.C. Residents*, WASH. POST, May 7, 2001, at B2, *reprinted in* J.A. C (First Am. Compl. App. 3).

Of particular importance for this litigation, the Act transferred approximately 1,840 residents of the predominantly African-American neighborhood of Kingman Park from Ward Six, located on the west side of the Anacostia River, to Ward Seven, which otherwise is located completely on the east side of the River. This boundary change allegedly was recommended by the Ward Six redistricting task force, appointed in the spring of 2001 by Sharon Ambrose, the D.C. Council Member representing Ward Six. The Kingman Park transfer, in conjunction with other boundary changes, reduced the African-American proportion of the Ward Six population from 68.7% to 62.3%. *Compare* Pre-Redistricting Ward Population By Race, *supra*, *with* District of Columbia Population by Single Race and Hispanic Origin by Amended Plan H Ward-2000 (prepared by the D.C. Office of Planning/State Data Center from U.S. Census Bureau data) (hereinafter "Post-Redistricting Ward Population By Race"), *reprinted in* J.A. C (First Am. Compl. App. 10). The African-American proportion of the population in Ward Seven, into which the Kingman Park residents were moved, changed from 96.9% to 96.8%. *See id.*

The Act also moved a significant portion of the Chevy Chase neighborhood, located on the western side of Rock Creek Park, from Ward Three to Ward Four. Ward Four is considered by some to be "the heart of the city's upper- and middle-class black establishment," and, prior to redistricting, was located completely on the eastern side of Rock Creek Park. *See* Chan, *supra*, at B2. The African-American proportion of the Ward Three population was reduced from 6.3% to 5.1%. *See* Pre-Redistricting Ward Population By Race, *supra*, and Post-Redistricting Ward Population By Race, *supra*.

On December 27, 2001, five days before the new boundaries took effect, appellant KPCA brought suit against the mem-

bers of the Council in their official capacities and the Mayor in his official capacity. On July 26, 2002, the complaint was amended to include appellant CCCA as a co-plaintiff. KPCA is an unincorporated neighborhood association established in the 1920s. It has approximately 100 active members, all of whom were registered voters of former Ward Six and appear now to be divided between Wards Five, Six, and Seven. *See* First Am. Compl. ¶ 4, *reprinted in* J.A. C; Tr. of Motions Hearing at 31, *Kingman Park Civic Ass'n v. Williams* (D.D.C. Aug. 13, 2002) (Civ. Action No. 01-2675) (hereinafter "Tr. of Motions Hearing"), *reprinted in* J.A. E. CCCA is a recently established unincorporated neighborhood association with less than 25 active members, all of whom are registered voters in Ward Three. First Am. Compl. ¶ 5(b), *reprinted in* J.A. C.

The gravamen of appellants' complaint is that the transfer of the Kingman Park residents from Ward Six to Ward Seven diluted African-American voting strength in violation of § 2 of the Voting Rights Act. The complaint alleged, in addition, that the Act diluted African-American voting strength throughout the city by reducing African-American majorities in wards with a significant white minority and "packing" African-American voters into wards with an African-American supermajority. Appellants further claimed that the Act violated provisions of D.C. law prohibiting adoption of redistricting plans with the purpose and effect of diluting minority voting strength, and requiring that wards be compact, approximately equal in size, and conform to census tracts. Appellants initially alleged that the KPCA and its members were excluded from participation in the Ward Six redistricting task force in violation of the due process clauses of the Fifth and Fourteenth Amendments, but withdrew this claim prior to the District Court's decision. *Kingman Park Civic Ass'n v. Williams*, Civ. Action No. 01-2675, slip op. at 11 n.9 (D.D.C. Aug. 14, 2002), *reprinted in* J.A. A.

The Council and the Mayor moved separately to dismiss, or in the alternative, for summary judgment. The District Court dismissed the complaint against the Council members on the ground that they were entitled to absolute legislative

immunity from suit for their official actions in connection with the adoption of the Act. *Id.* at 4-5. The court went on to dismiss all of appellants' claims against the Mayor. As to the claim of vote dilution in Wards Six and Seven, in which appellant KPCA's members reside, the court dismissed the complaint for failure to state a claim under § 2 of the Voting Rights Act. *Id.* at 6-9. The court held that appellants lacked standing to challenge "citywide" vote dilution outside of Wards Six, Seven, and Three, but concluded that, even if they did have standing, they failed to state a claim under the Voting Rights Act. Having dismissed appellants' federal claims, the court dismissed the pendent D.C. law claims pursuant to 28 U.S.C. § 1367. *Id.* at 11. This appeal followed.

## II. ANALYSIS

Appellants maintain two claims on appeal. First, they renew their claim that the Act dilutes African-American voting strength, in violation of § 2 of the Voting Rights Act, by transferring residents of Kingman Park from Ward Six to Ward Seven and by transferring residents of Chevy Chase from Ward Three to Ward Four. Second, they assert, for the first time on appeal, that the Act results in racially discriminatory gerrymandering in violation of the Fourteenth and Fifteenth Amendments. We hold that the Mayor is entitled to summary judgment on the first claim, and that the second claim is not properly before this court because it was not raised below.

### A. Threshold Issues

A threshold concern is presented by the Mayor's assertion that he is entitled to legislative immunity from suit, because his authority and actions in connection with the Ward Redistricting Act are strictly legislative in nature. We decline to reach the merits of this argument. In proceedings before the District Court, counsel for the Mayor disavowed any claim to legislative immunity in this action insofar as the Mayor was sued in his official capacity. Tr. of Motions Hearing at 56-67.

Therefore, the legislative immunity claim was expressly waived and cannot be resurrected on appeal.

We likewise decline to address the merits of the Mayor's claim, raised for the first time on appeal, that the District of Columbia is not a "State or political subdivision" to which § 2 of the Voting Rights Act applies. *See* 42 U.S.C. § 1973 (2003). "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The Mayor's claim raises a pure question of law, which is within our discretionary authority to address. *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 & n.5 (D.C. Cir. 1992). The issue presented, however, is of sufficient public importance and complexity to counsel strongly against deciding it in this posture. Appellants had no opportunity to address this defense prior to filing their reply brief. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 697 (D.C. Cir. 1991) (stating that, in exercising its discretion as to whether to hear an issue not raised below, the court will look to whether the issue has been fully briefed by the parties). We need not resolve this question, moreover, because we decide the Voting Rights Act claims in the Mayor's favor without turning to this untimely raised defense.

## B. Voting Rights Act Claims

### 1. *Dismissal for Failure to State a Claim*

This court reviews *de novo* the District Court's dismissal of a complaint for failure to state a claim, accepting plaintiffs' factual allegations as true, and giving plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citations omitted).

We find that the District Court erred in dismissing appellants' Voting Rights Act claims against the Mayor under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion is intended to test the legal sufficiency of the

9

complaint. *Browning*, 292 F.3d at 242. But the complaint need only set forth "a short and plain statement of the claim," F_{ED}. R. C_{IV}. P. 8(a)(2), giving the defendant fair notice of the claim and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Id.* at 47-48. In light of these liberal pleading requirements, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45-46.

Section 2(a) of the Voting Rights Act provides, in relevant part, that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color. . . ." 42 U.S.C. § 1973(a) (2003). A violation of this prohibition is established

> if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b) (2003).

In order to survive a motion to dismiss under Rule 12(b)(6), appellants were required only to allege that the Ward Redistricting Act dilutes minority voting strength such that minority voters in the relevant wards have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *See*

*Sparrow*, 216 F.3d at 1115 ("Because racial discrimination in employment is 'a claim upon which relief can be granted,'.... 'I was turned down for a job because of my race' is all a complaint has to say to survive a motion to dismiss under Rule 12(b)(6)." (internal quotation marks and citations omitted)). Appellants were not required on the face of their complaint to allege every legal element or fact that must be proven in a vote dilution claim. *See id.* at 1114-15; *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) ("[C]omplaints need not plead law or match facts to every element of a legal theory." (internal quotation marks and citation omitted)); *Atchinson v. District of Columbia*, 73 F.3d 418, 421-22 (D.C. Cir. 1996) ("A complaint . . . need not allege all that a plaintiff must eventually prove.").

Appellants' complaint clearly passes this test. Counts I, II, and III of the complaint allege that the defendants manipulated ward boundaries with the purpose and effect of "packing" African-American voters into supermajority African-American wards and decreasing the African-American proportion of the overall and voting-age population in every ward in which the white proportion of the population was 10.3% or greater. *See* First Am. Compl. ¶ ¶ 27-47, *reprinted in* J.A. C. The complaint specifically alleged that the Act resulted in the reduction of the African-American proportion of the Ward Six population from 68.7% to 62.3%, in part by transferring 1,840 African-American voters from Kingman Park to Ward Seven, a supermajority African-American ward. *See id.* ¶ ¶ 17-26. No more was necessary to withstand a Rule 12(b)(6) motion.

We acknowledge that "it is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible." *Sparrow*, 216 F.3d at 1116. Appellants did not do so here. Although appellants' complaint alleges that African Americans remain an absolute majority in Ward Six and in every other ward in which they were a majority prior to redistricting, this does not suffice to place it "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley*, 355 U.S. at 45-46. Vote dilution claims must be assessed in light of the

demographic and political context, and it is conceivable that minority voters might have "less opportunity . . . to elect representatives of their choice" even where they remain an absolute majority in a contested voting district.

### 2. *Summary Judgment*

While we find that dismissal under Rule 12(b)(6) was improper, we nevertheless affirm the District Court's judgment in favor of the Mayor on summary judgment grounds. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997) ("Here in fact the [defendant's] motion to dismiss requested summary judgment in the alternative [to dismissal under Rule 12(b)(6)], and if summary judgment is the correct disposition, we may convert and affirm on those grounds.").

Summary judgment under Rule 56 is appropriate where the pleadings and the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986). The moving party is not required to support its motion for summary judgment with "affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis in original). Rather,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322.

Where the moving party has properly supported its motion, Rule 56 does not permit the nonmoving party to rest upon its pleadings. Rather, the nonmoving party's opposition must, by affidavits or otherwise, "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The District Court may deny or defer ruling on the motion

for summary judgment in order to permit discovery. *See* FED. R. CIV. P. 56(f); *Anderson*, 477 U.S. at 250 n.5 (noting that summary judgment should be refused "where the non-moving party has not had the opportunity to discover information that is essential to his opposition").

In order to make out a prima facie case of vote dilution under § 2, appellants must satisfy the three threshold conditions set forth by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986). They must establish: (1) that the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that the "majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51. While *Gingles* itself involved a multimember district, the Supreme Court has made clear that these conditions must likewise be met in actions, such as this, challenging one or more single-member districts. *See Growe v. Emison*, 507 U.S. 25, 40-41 (1993). If the *Gingles* conditions are met, a court then must determine whether the "totality of the circumstances" indicates that minority voters have been denied equal opportunity to participate in the political process. *See Johnson v. De Grandy*, 512 U.S. 997, 1009-12 (1994).

To satisfy the first *Gingles* condition, appellants must show "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.* at 1008. Appellants fail to establish a triable issue as to this condition with regard to Ward Three. African Americans represented 6.3% of the Ward Three population prior to redistricting, and 5.1% after redistricting. Appellants have not identified, nor on the record does it appear possible to identify, an alternative plan creating more than the existing number of majority African-American wards in the area shared by Ward Three and the adjacent wards (*i.e.*, Wards One, Two, and Four).

We will assume, without deciding, that appellants have met the first *Gingles* condition with respect to Ward Six. *Cf. id.* at 1009 (assuming, without deciding, that the first *Gingles*

condition has been satisfied). While African Americans remain the majority in the post-redistricting Ward Six population, it is at least conceivable that the reduction in the African-American proportion of the population from 68.7% to 62.3% might deprive African Americans of an "effective" or "safe" voting majority in that ward. Given the high proportion of African Americans in adjacent Ward Seven (96.8%), it is possible that two "safe" majority-minority wards could be created in the area shared by Ward Six and Ward Seven.

Even if appellants are given the benefit of this assumption, however, they fail to establish a triable issue as to the second and third *Gingles* conditions with regard to Ward Six *or* Ward Three. Appellants have not alleged that African-American voters in Ward Six or Ward Three are politically cohesive or that Ward Six or Ward Three is characterized by racially polarized voting. Nor have appellants submitted affidavits or any other evidence supporting such a conclusion. There is no evidence in the record relating to the breakdown by racial group of voting preferences or patterns in Ward Six, Ward Three, or elsewhere in the District. *See Growe*, 507 U.S. at 41-42 (holding that "Section 2 'does not assume the existence of bloc voting: plaintiffs must prove it'") (quoting *Gingles*, 478 U.S. at 46). Appellants did not seek discovery on this issue, either before or after defendants submitted their motions to dismiss or for summary judgment.

Appellants' statement of material facts in dispute, submitted with their motion opposing summary judgment, repeatedly states the legal conclusion that the redistricting plan "unlawfully diluted" minority voting strength, but it makes no mention of minority political cohesiveness or racially polarized voting. *See* Statement of Material Facts as to Which Exist Genuine Issues in Dispute, *reprinted in* J.A. B. The four declarations and 10 exhibits accompanying appellants' opposition to summary judgment are likewise devoid of any statement or evidence related to minority political cohesiveness or racially polarized voting. *See* Opp'n to Council Def. and Def. Williams' Mot. to Dismiss or for Summ. J., *reprinted in* J.A. B. Finally, in the hearing before the District Court on the motion to dismiss or for summary judgment, counsel for

appellants expressly stated that the only facts at issue in the case were "missing" statistics as to the breakdown by race of the voting-age population in the new wards created by the Act. Tr. of Motions Hearing at 37-38. With that exception, appellants maintained, "[e]verything else is undisputed." *Id.* at 37.

In sum, appellants have made no showing that there exists a triable issue as to minority political cohesiveness or racially polarized voting. As a result, they fail to make the required showing as to the second and third *Gingles* conditions, which are "element[s] essential to" their case upon which they will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. The Mayor therefore is entitled to summary judgment on the Voting Rights claims against him.

## C. Remaining Issues

In addition to the Voting Rights Act claims, appellants assert, for the first time on appeal, that the Ward Redistricting Act violates the Fourteenth and Fifteenth Amendments. They allege that race was the "predominate factor" in redrawing ward boundaries under the Act, and that the Act had the purpose and effect of discriminating on the basis of race. We decline to address the merits of this untimely claim. Racial gerrymandering claims of this nature involve highly complex factual inquiries, focusing on the interaction of geography, demography, and politics. *See, e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 241-58 (2001) (evaluating and overturning a three-judge district court's finding that race was the predominant factor in redistricting). The general presumption against deciding claims not raised below is particularly strong where, as here, the claim turns upon factual questions not yet passed upon by the district court. *See Boehner v. Anderson*, 30 F.3d 156, 163 (D.C. Cir. 1994) (declining to reach a claim predicated on a factual assumption not established below); *Texas Rural Legal Aid*, 940 F.3d at 697 (in deciding whether to hear a claim not raised below, the court will look to "whether decision of the issue would be aided by the development of a factual record in the district court").

Having determined that the Mayor was entitled to summary judgment on the sole federal claim properly before this

court, we affirm the District Court's dismissal under 28 U.S.C. § 1367 of the pendent D.C. law claims against him. That provision authorizes a district court to decline to exercise supplemental jurisdiction over pendent claims if "the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c) (1993). Dismissal of the pendent claims was appropriate here, where all of the federal claims were properly resolved against appellants. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

Finally, we turn to appellants' claims against the Council. As noted above, appellants withdrew their due process claims regarding the Ward Six redistricting task force before the District Court issued its decision. Appellants' only remaining federal claim against the Council is the challenge, under § 2 of the Voting Rights Act, to the lawfulness of the Ward Redistricting Act. This claim is identical to the Voting Rights Act claim decided in favor of the Mayor. Because the merits of the Voting Rights Act claim have been dispositively resolved against appellants, the identical claim against the Council no longer raises a substantial federal question.

Accordingly, we affirm the District Court's dismissal of the Voting Rights Act counts of the complaint against the Council on the alternative ground that there was no substantial federal question conferring jurisdiction. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1167 (D.C. Cir. 2002) (affirming the dismissal of claims against one defendant for lack of a substantial federal question, because the court had "dispositively resolve[d] the identical claims" against the other defendant on the same appeal), *cert. denied*, 123 S. Ct. 1250 (2003). We affirm dismissal of the pendent D.C. law claims against the Council on the same basis. Consequently, we need not address the Council members' assertion of legislative immunity.

## III. CONCLUSION

For the reasons stated above, we affirm the judgment of the District Court in favor of the Mayor with respect to

appellants' Voting Rights Act claims. On the record before us, the Mayor is entitled to summary judgment on these claims. We likewise affirm the District Court's dismissal of the pendent D.C. law claims pursuant to 28 U.S.C. § 1367. Finally, having dispositively resolved the merits of appellants' Voting Rights Act claims in favor of the Mayor, we affirm dismissal of the identical federal and pendent D.C. law claims as to the Council for lack of a substantial federal question conferring jurisdiction.