# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2019        Decided February 28, 2020

No. 18-7161

HE DEPU, ET AL.,
APPELLANTS

v.

YAHOO! INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00635)

*Times Wang* argued the cause and filed the briefs for appellants.

*Matthew Allen Fitzgerald* argued the cause for appellees. With him on the brief were *Elizabeth P. Redpath*, *David I. Bledsoe*, *Mikhael D. Charnoff*, *William D. Blakely*, and *George E. Kostel*.

Before: SRINIVASAN, *Chief Judge*,[*] and GARLAND and WILKINS, *Circuit Judges*.

---

[*] Chief Judge Srinivasan was a member of the panel at the time the case was argued but did not participate in this opinion.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   The plaintiffs in this case are Chinese citizens who were imprisoned for expressing dissent on the internet.  The defendants are Yahoo, a web services provider now owned by Verizon Media, and associated entities and individuals.  The plaintiffs allege that, as part of the settlement of an earlier lawsuit, Yahoo established a charitable trust to provide humanitarian and legal assistance to imprisoned Chinese dissidents.  Thereafter, they charge, the defendants improperly depleted the trust's funds and terminated it altogether.

The district court dismissed the plaintiffs' complaint on the threshold grounds that they failed to plausibly allege either: (1) that Yahoo established a charitable trust, or (2) that they have standing to bring such a claim under the law of the District of Columbia.  We conclude that the plaintiffs plausibly alleged both.  Accordingly, we reverse the dismissal of the complaint.

I

In April 2007, Wang Xiaoning and Shi Tao, two imprisoned Chinese dissidents, and Wang's wife, Ling Yu, sued Yahoo for violations of federal and state law.  They alleged that Yahoo had abetted Wang's and Shi's imprisonment by turning over their Yahoo email account information to the Chinese government, which used the information to prosecute them for political dissent.  *See* Second Am. Compl. (SAC) ¶ 2; *Wang v. Yahoo! Inc.*, No. 07-cv-2151-CW (N.D. Cal. Apr. 18, 2007), 2007 WL 1230526.  In late 2007, Yahoo settled the case.

The 2007 Settlement Agreement provided for payments of $3.2 million each to the families of Wang and Shi, the money "to be held in trust" by a non-profit organization, the Laogai Research Foundation (the "Foundation").   Settlement

Agreement § II.B (J.A. 175). The Agreement also provided for another payment of $17.3 million to be "made in trust" to the Foundation, to be maintained "separately from other Foundation funds" and to be "known as the 'Yahoo! Human Rights Fund'" (the "Fund"). *Id.* § II.C. The Fund was to be used "for three purposes only:

> (a) to provide humanitarian and legal assistance primarily to persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium; (b) to resolve claims primarily by such persons, or persons threatened with prosecution or imprisonment, against the Yahoo! Entities . . . ; and (c) for payment of Foundation operating expenses and the Foundation's educational work conducted in the United States in support of human rights.

*Id*. § II.C.2.

In 2017, the plaintiffs here -- seven Chinese citizens, who allege that China also imprisoned them for their online speech, again with evidence obtained from their Yahoo accounts -- sued Yahoo, the Foundation, and the other defendants. Six of the plaintiffs allege that they received money from the Fund's assistance program in the past and remain potential future recipients. SAC ¶¶ 10-15. The seventh alleges that he applied for funding but was advised that the program had been terminated. *Id.* ¶ 16.

The plaintiffs claim that the 2007 Settlement Agreement established the Fund as a charitable trust and that the defendants are its trustees. *Id.* ¶¶ 1, 17-27. They allege that a purpose of the Fund was to provide humanitarian and legal assistance to Chinese dissidents imprisoned for expressing their views online.

*Id.* ¶¶ 1, 39-40. As beneficiaries of that purpose, they also allege a "special interest" in enforcement of the trust. *Id.* ¶ 136. Finally, they allege that the defendant-trustees violated their fiduciary duties by improperly depleting the trust's assets and, ultimately, terminating the trust's humanitarian and legal assistance program altogether. *Id.* ¶ 151.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the district court dismissed the plaintiffs' first amended complaint with prejudice for failure to state a claim. The court did not reach the plaintiffs' allegations of breach of fiduciary duty. Instead, it held that the plaintiffs had failed to plausibly allege either: (1) that the Settlement Agreement established a charitable trust, or (2) that the plaintiffs had the kind of "special interest" standing required to enforce the alleged trust. *He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 187-91 (D.D.C. 2018).

Thereafter, the plaintiffs moved to alter the prejudicial effect of the court's order under Federal Rule of Civil Procedure 59(e), and for leave to file a second amended complaint under Rule 15(a)(2). The court denied both motions, concluding that no additional allegations consistent with the first amended complaint could save its claims and that the proposed second amended complaint was "futile" because it did not cure the two deficiencies noted in the preceding paragraph. *He Depu v. Yahoo! Inc.*, 334 F. Supp. 3d 315, 319-21 (D.D.C. 2018). Those asserted deficiencies are the only issues on this appeal.[1]

---

[1] In ruling on the plaintiffs' Rule 59(e) motion, the district court "conclude[d] that its finding that plaintiffs lack standing to enforce any charitable trust [did] not independently warrant dismissal with prejudice" of the first amended complaint. *He Depu*, 334 F. Supp. 3d at 320 n.6. It therefore went on to address (and dismiss) the standing allegations of the second amended complaint. *Id.* at 323-24. Accordingly, for the allegations of special interest standing, we must

## II

We review a district court's dismissal of a complaint for failure to state a claim de novo. *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss, a court may (and in this case did) consider documents "attached to or incorporated in the complaint." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

The plaintiffs here invoked the diversity jurisdiction of the district court, *see* 28 U.S.C. § 1332(a), which was therefore charged with applying the substantive law of the District of Columbia, *see Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006). Typically, "to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered this case," *id.*, we look to that

---

examine the second amended complaint. With respect to the establishment of a charitable trust, the district court found that the second amended complaint merely "repackage[d] identical facts" from the first amended complaint. *Id*. at 320 n.7. Thus, for ease of reference, this opinion will cite to the second amended complaint on both issues. *See also* Yahoo Br. 41-43 (advising that there is "no reason for this Court to address the Rule 59 issue," *id.* at 41, because the district court "considered the[] Second Amended Complaint anyway" and because "there is no meaningful difference between the two" complaints, *id.* at 43). In any event, because we find that both complaints are sufficient to survive a motion to dismiss, we reverse the district court's rulings regarding Rules 59(e) and 15(a)(2).

court's published opinions, *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 22 (D.C. Cir. 2014).

The challenge here is that only a few D.C. Court of Appeals cases examine the two issues presented by this appeal, while an "almost endless variety" of legal relationships can arise from a transfer of funds. GEORGE G. BOGERT ET AL., THE LAW OF TRUSTS AND TRUSTEES ch. 2 intro. (3d ed. 2017) [hereinafter BOGERT ON TRUSTS]. In these circumstances, reasonable minds may well differ as to the proper application of limited case law to the factual allegations of a complaint. And because we must review the dismissal of a complaint de novo, we may be required to depart from the district court's conclusions, even if they are reasonable.

That is the result we reach here. We conclude that the complaint in this case plausibly alleges both that Yahoo created a charitable trust and that the plaintiffs' "special interest" in the trust is sufficient to give them standing to enforce it.

A

We begin with the question of whether the plaintiffs plausibly allege that Yahoo established a charitable trust in 2007.

As the D.C. Court of Appeals has explained, the elements of a trust are: "1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; 2) a beneficiary, to whom the trustee owes such duties; [and] 3) the trust property, which is held by the trustee for the beneficiary." *Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983) (citing, inter alia, RESTATEMENT (SECOND) OF TRUSTS §§ 2, 23, 24, 32 [hereinafter RESTATEMENT (SECOND)]). "As distinguished from a private trust, which is characterized by

identified beneficiaries, . . . in a charitable trust 'the obligation of the trustee is to apply the trust res for some form of public benefit.'" *Hooker v. Edes Home*, 579 A.2d 608, 611 (D.C. 1990) (quoting BOGERT ON TRUSTS § 411).[2]

In addition, "there must be proof of the settlor's intention to create a trust." *Duggan v. Keto*, 554 A.2d 1126, 1133 (D.C. 1989).[3] This intention to create a trust may be manifested "by written or spoken language or by conduct, in light of all surrounding circumstances." *Cabaniss*, 464 A.2d at 91. No magic words are required. *Id.* The principal dispute in this case centers on whether Yahoo manifested the requisite intention to create a trust.

1. As evidence of Yahoo's intention to create a trust, the plaintiffs point first to the text of the Settlement Agreement establishing the Fund. As we said in *Beckett v. Air Line Pilots Association*, "[a]n expressed intention to create a trust may be

---

[2] Because the D.C. Court of Appeals cites *Bogert on Trusts* and the *Restatement (Second) of Trusts* as authoritative in applying the common law of the District, we do so as well.

[3] According to the defendants, "the D.C. Court of Appeals has stated that 'the intention to create a trust should be *clearly* manifested.'" Yahoo Br. 12 (quoting *Duggan*, 554 A.2d at 1136 (emphasis added)). But the quotation the defendants cite is merely the D.C. Court of Appeals' quotation from a Maryland case describing Maryland law. *See Duggan*, 554 A.2d at 1136-37 (quoting *Moore v. Layton*, 127 A. 756, 757 (Md. 1925)). Noting that the Maryland case was "not binding," the D.C. Court of Appeals found it "persuasive [t]here *because its facts* [were] very similar." *Id.* at 1137 (emphasis added). And in stating the intention requirement elsewhere in the opinion, the court did not repeat the word "clearly." *Id.* at 1133, 1136. In any event, with or without the adverb, we conclude that the plaintiffs' complaint plausibly alleges trust intent.

revealed by . . . the articulation of the essential elements of a trust." 995 F.2d 280, 287 (D.C. Cir. 1993). The Agreement plausibly identifies all of them: a trustee (the Foundation), trust property ($17.3 million), and a charitable purpose ("humanitarian and legal assistance" to persons meeting specified criteria). Settlement Agreement § II.C.

Moreover, the Settlement Agreement specifically directs that Yahoo's payments to the Foundation be "made in trust." Settlement Agreement § II.C. The *Bogert* treatise, frequently cited by the D.C. Court of Appeals, states that in the context of a transfer to a charitable corporation (like the Foundation), if the transfer "used the words 'in trust' . . . , that language may be used to find an intent to make the corporation a trustee[.]" BOGERT ON TRUSTS § 324; *see In re Strack,* 524 F.3d 493, 499 (4th Cir. 2008) (noting that "the parties' use of the word 'trust' is to be given great weight").

An intention to create a trust may also be revealed by articulation of "the specifics necessary to implement and administer the trust." *Beckett*, 995 F.2d at 287 (internal quotation marks omitted). Here, the Settlement Agreement subjects the Foundation's handling of the Fund to trust-like restrictions, and does so in imperative language. *See Cabaniss*, 464 A.2d at 91-92 ("Among the . . . factors pertinent to a determination of a settlor's intention to create a trust are . . . the imperative, as distinguished from precatory, nature of the words used.").[4] It prohibits the Foundation from commingling Fund monies with its own general funds, *see* Settlement Agreement § II.C ("[T]hese payments *shall* be maintained separately from other Foundation funds." (emphasis added)), an indicator of trust

---

[4] *See also Beckett*, 995 F.2d at 287 (relying in part on a settlement agreement's use of "the mandatory 'shall'" to conclude that it created a trust).

intent.[5]  It provides that the money "may be used for three purposes *only*," "*shall not* be used" for specified prohibited purposes, and includes specific mechanisms to remedy "any disbursements that do not conform with the stated purposes" of the Fund.  Settlement Agreement §§ II.C, II.C.2, II.C.2(iii) (emphases added).  The Agreement also bars the Foundation from spending more than $1 million per year of the Fund on its own operating expenses, *id.* § II.C.2(iii), and requires it to provide semi-annual reports of its activities, *id.* § II.C.2(vi).  All of this together plausibly signals the hallmark of a charitable trust:  "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for a charitable purpose."  RESTATEMENT (SECOND) § 348; *see Cabaniss*, 464 A.2d at 91.[6]

The complaint also alleges circumstances surrounding the creation of the Fund that are probative of trust intent.  For example, the complaint alleges that the plaintiffs in the original *Wang* lawsuit met with Yahoo's then-CEO, Jerry Yang, on November 7, 2007, to discuss settlement.  SAC ¶¶ 32-33.  At that meeting, Yang allegedly promised to "finance a trust fund to provide financial assistance to imprisoned Chinese dissidents."  *Id.* ¶ 33.  The complaint further alleges that Yahoo publicly stated that it wanted to go beyond just "provid[ing]

---

[5] *See, e.g.*, *In re Strack*, 524 F.3d at 499 (holding that a segregation of funds provision supports a finding of trust intent); *Quaif v. Johnson*, 4 F.3d 950, 954 (11th Cir. 1993) (same); *In re Prof'l Air Traffic Controllers Org. (PATCO)*, 26 B.R. 337, 343-44 (Bankr. D.D.C. 1982) (same).

[6] The defendants do not dispute that the Foundation appears to hold legal but not equitable title to the Fund, arguing only that such evidence is not "probative of charitable trust intent in this context." Yahoo Br. 26.  We disagree.

financial, humanitarian and legal support" to the *Wang* plaintiffs through a "private agreement," and instead wanted to ensure "our actions match our values" by establishing "a separate human rights fund to provide humanitarian and legal support to political dissidents who have been imprisoned for expressing their views online." *Id.* ¶ 42.[7]

2. In response to these indicia of trust intent, the defendants levy a barrage of counter-arguments. They are not persuasive.

---

[7] In the district court, the defendants argued and the court agreed that dismissal of the first amended complaint with prejudice was warranted because the "plaintiffs' only theory for the existence of any trust relied on the language of the settlement agreement itself," and thus they could not -- by further amendment or otherwise -- rely on "conduct" or other extra-textual support. *He Depu*, 334 F. Supp. 3d at 319-20. The defendants did not repeat this argument in their appellate brief, and rightly so. The plaintiffs' complaint relied on the language of the agreement not as a theory of liability but as *evidence* of the trust relationship that was the predicate for their theory of liability. *See* First Am. Compl. ¶¶ 33-46, 125-31 (J.A. 26-30, 52-54). A plaintiff's proof is not limited to the evidence cited in the complaint. *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). In any event, the complaint did rely on conduct and other extra-textual support as well. *See* First Am. Compl. ¶¶ 33, 41, 43 (J.A. 26, 28-29).

At oral argument in this court, the defendants suggested that we could not look outside the four corners of the Settlement Agreement for evidence of trust intent, presumably as a matter of trust law. Recording of Oral Arg. at 35:39. They did not take this position in their brief, and it directly contradicts District of Columbia precedent, which expressly authorizes examination of "extrinsic circumstances." *Cabaniss*, 464 A.2d at 91-92; *see Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 246 (D.C. 2015).

It is true, as the defendants argue, that the Settlement Agreement's use of the words "in trust" is not "determinative." Yahoo Br. 25-26 (citing *In re Strack*, 524 F.3d at 499; BOGERT ON TRUSTS § 324). But whether those (or any other) words conclusively establish the existence of a trust is not before us. At the motion-to-dismiss stage, the only question is whether the words used make the existence of a trust "plausible." *See Iqbal*, 556 U.S. at 678.

The defendants also argue that the Settlement Agreement is merely a settlement "contract -- with no trust document or announcement of trust intent in sight." Yahoo Br. 8. The latter claim is plainly incorrect, given the Agreement's express use of the phrase "in trust" as well as the other indicia noted above. As to the claim that the Agreement is just a settlement contract, "[i]t is settled that the mere existence of a contractual relationship does not preclude the existence of a trust relationship." *Christiansen v. Nat'l Sav. & Tr. Co.*, 683 F.2d 520, 530 (D.C. Cir. 1982); *see* BOGERT ON TRUSTS § 323 (explaining that a charitable trust can be created "by the making of a contract by the settlor in favor of a trustee"). Nor is it unusual for a trust to be established as part of a settlement agreement.[8] The fact that Yahoo "aimed to resolve claims brought against Yahoo by the Wang parties," Yahoo Br. 15 (citing Settlement Agreement § I.B.3); *He Depu*, 306 F. Supp. 3d at 189, does not preclude its establishment of a charitable trust as part of that settlement.

The defendants further rely on a provision of the Settlement Agreement that disclaims the existence of third-party

---

[8] *See, e.g.*, *Beckett*, 995 F.2d at 285-86 (holding that a contract to settle a case "established a trust"); *D'Agrosa v. Coniglio*, 824 N.Y.S.2d 761 (Sup. Ct. 2006) (analyzing a trust arising in connection with a settlement); *In re Estate of Binder*, 386 N.W.2d 910, 913 (N.D. 1986) (same).

beneficiaries, Settlement Agreement § IV.N, to insist that Yahoo cannot have intended to create a trust.  But such a provision is not necessarily inconsistent with trust intent.  The provision may bar third parties from suing for breach of contract, but it is black-letter law that -- with or without such a provision -- a "trustee who fails to perform his duties as trustee is not liable to the beneficiary for breach of contract."  RESTATEMENT (SECOND) § 197 cmt. b.  That is so because a trustee's "duties are not contractual in nature."  *Id.* § 169 cmt. c; *see id.* § 74 cmt. a (stating that trust beneficiary status arises from the "trust relation" itself and is not "based . . . upon contract"); *see also Christiansen*, 683 F.2d at 530 (distinguishing between a third-party beneficiary contract and a trust).

The defendants further point out that, although the Settlement Agreement lists the first purpose for which the Fund may be used as "humanitarian and legal assistance," the second purpose listed is to resolve claims brought against Yahoo. Noting that "not all jurisdictions even *recognize* 'mixed trusts'" with both charitable and private purposes, they maintain that therefore the Fund cannot constitute a charitable trust.  Yahoo Br. 20.  But we apply the law of the District of Columbia, not the law of "all" jurisdictions.  And the D.C. Uniform Trust Code does recognize the validity of mixed trusts.  *See* D.C. CODE § 19-1301.03(3) (defining a charitable trust as "a trust, *or portion of a trust*, created for a charitable purpose" (emphasis added)).[9]

---

[9]  The district court held that the plaintiffs could not make this "mixed trust" argument because they had not alleged a "mixed trust" in their first amended complaint.  *He Depu*, 306 F. Supp. 3d at 189 n.5.  But a plaintiff is not required to include in its complaint every argument that might support its general claims.  *See Kingman Park Civic Ass'n,* 348 F.3d at 1040.  In any event, the second amended complaint does allege that the Fund is "at least in part, a charitable

Still, the defendants warn, the Fund's private claims-resolution purpose could have "theoretically" exhausted the entire Fund. Yahoo Br. 20. But where a trust has multiple beneficiaries, trustees must act "impartially in . . . [the distribution of] trust property," paying "due regard" to the "respective interests" of each. D.C. CODE § 19-1308.03. The Foundation could not have distributed all $17.3 million of the Fund to fulfill its claims-resolution purpose without running afoul of this requirement. *See also* Settlement Agreement § II.C.2(i) (requiring the Foundation to use its "best efforts to maximize the benefits achieved through [ ] use of *a portion* of the [ ] Fund for humanitarian and legal assistance" (emphasis added)).

Finally, the defendants shift focus from the original 2007 Settlement Agreement to Yahoo's later establishment, in 2009, of a different trust. They note that the document Yahoo used in 2009 expressly denominated the fund it established there as a "trust" and the holders of that fund as "trustees." Agreement & Decl. of Trust (J.A. 132). This, they assert, is "fatal" to the plaintiffs' claim concerning the 2007 Agreement. Yahoo Br. 23. But although language like "'in trust' or 'trustee' in connection with [a] transfer . . . may be used to find an intent to make the [transferee] a trustee," the "failure to use such language is not conclusive." BOGERT ON TRUSTS § 324.[10] Nor is it dispositive

---

trust, and/or a mixed trust." SAC ¶ 1; *id.* ¶ 40.

[10] *See In re PATCO*, 26 B.R. at 343-44 (holding that "the mere fact that the terms 'trust' or 'trustee' were not specifically employed . . . is not dispositive" of whether there was an intention to create a trust); *In re Timothy Dean Rest. & Bar*, 342 B.R. 1, 9-10 (Bankr. D.D.C. 2006) (holding, under D.C. law, that an arrangement constituted a trust notwithstanding that the document did not use the term "trust").

of Yahoo's intent in executing the 2007 Settlement Agreement that two years later it used more formal documents to create a different trust.

3.  For the above reasons, we conclude that the plaintiffs' complaint plausibly alleges that the Settlement Agreement created a charitable trust.

B

The defendants argue, and the district court agreed, that even if the complaint plausibly alleges that the Settlement Agreement created a charitable trust, it does not plausibly allege that the plaintiffs have standing to enforce that trust under District of Columbia law.[11]  Traditionally, "only a public officer, usually the state Attorney General" could bring an action to enforce a charitable trust.  *Family Fed'n for World Peace*, 129 A.3d at 244 (quoting *Hooker*, 579 A.2d at 612).  However, in light of the "exponential expansion of charitable institutions" and a "busy Attorney General," the District of Columbia has "relax[ed]" this rule, granting standing to those with "a 'special interest' in continued performance of the trust distinguishable from that of the public at large."  *Id.* (quoting *Hooker*, 579 A.2d at 612) (internal quotation marks omitted).

*Hooker v. Edes Home* is the leading District of Columbia case on "special interest" standing.  The case concerned a challenge to the closing, sale, and relocation of the Edes Home, a charitable corporation.  *Hooker*, 579 A.2d at 608.  The Home was established pursuant to the will of Margaret Edes, who bequeathed the residue of her estate to maintain a free home "for aged and indigent Widows, residing, or to reside," in

_____

[11]  This is distinct from Article III standing, which all parties and this court agree the plaintiffs have.  *See* Yahoo Br. 29 n.4.

Georgetown. *Id.* at 609. Subsequently, the trustees adopted by-laws that "established additional admission criteria beyond those set out in the will," *id.*, requiring that residents be "in good health" and "have been for at least five years immediately preceding the date of application residents of Georgetown," *id.* at 615. The D.C. Court of Appeals held that members of a class of elderly, indigent, and widowed residents of the District of Columbia had the requisite "special interest" standing to sue. *Id.* at 608-09.

*Hooker* established two requirements for "special interest" standing: (1) that the action challenge an "extraordinary measure threatening the existence of the trust," not just an "ordinary exercise of discretion" committed to the trustees; and (2) that the plaintiffs belong to a class of potential beneficiaries that is "sharply defined" and "limited in number." *Id.* at 614-15. The court held that the plaintiff widows met both requirements. *Id.* at 609.

The defendants do not dispute that this case satisfies *Hooker*'s first prong. *See* Recording of Oral Arg. at 26:30. Nor could they. The plaintiffs challenge the outright termination of the Fund, SAC ¶¶ 74-75, 151, and there could hardly be anything more "threatening [to its] existence," *Hooker*, 579 A.2d at 615. Instead, the defendants assert that the plaintiffs cannot meet *Hooker*'s second prong. We disagree.

1. First, the plaintiffs plausibly allege that they belong to a class of potential beneficiaries that is "sharply defined." *Hooker*, 579 A.2d at 614. For a class to meet this description, there must be "definite criteria . . . identifying its present members with . . . particularity." *Id.* at 615. Here, the plaintiffs' proffered class includes these defining criteria: (1) Chinese persons, (2) imprisoned in China, (3) for exercising their freedom of expression, (4) online. SAC ¶ 136.

These criteria are grounded in the language of the Settlement Agreement, which directs the Fund to assist "primarily [ ] persons in or from the People's Republic of China who have been imprisoned for expressing their views through Yahoo! or another medium." Settlement Agreement § II.C.2. According to the complaint, Yahoo also repeatedly touted the Fund as intended for "dissidents who have been imprisoned for expressing their views online." SAC ¶¶ 42, 45, 113. And after the settlement, Yahoo allegedly drafted guidelines for the Fund that gave the "highest priority" to Chinese persons, imprisoned (or otherwise subject to "violations of fundamental human rights") for the exercise of their freedom of expression using "Yahoo's services or other electronic media." SAC ¶¶ 50-51.[12]

The defendants contend that the above-described criteria are insufficiently narrow. But they are sufficient under *Hooker*. As set out above, *Hooker* found the plaintiffs' proffered class of beneficiaries sufficiently narrow because the Edes will and a subsequent charter required "the beneficiary to be (1) female, (2) indigent, (3) aged, and (4) widowed," and because subsequent "by-laws further require[d] her (5) to 'be in good health' (certifiably) and (6) to 'have been for at least five years immediately preceding the date of application [a] resident[ ] of

---

[12] The Yahoo defendants maintain that the guidelines the plaintiffs cite in their complaint were not for the 2007 Fund, but rather for the 2009 trust, and that the final guidelines for that trust did not use the terms "'priority' or 'highest priority.'" Yahoo Br. 37. The plaintiffs disagree, maintaining that the guidelines they cite were for the 2007 Fund and differ from the later guidelines. Reply Br. 5. Needless to say, this is a factual dispute inappropriate for resolution at the motion-to-dismiss stage. *See Iqbal*, 556 U.S. at 678 (noting that, at the motion-to-dismiss stage, the complaint's factual matter is "accepted as true").

Georgetown.'" 579 A.2d at 615. The Settlement Agreement and subsequent guidelines have a similar narrowing effect.

The defendants argue that the Fund is not strictly limited to individuals in China and could extend to online dissidents anywhere. In *Hooker*, however, the court approvingly discussed *Alco Gravure*, *Inc. v. Knapp Found.*, 479 N.E.2d 752 (N.Y. 1985), in which the New York Court of Appeals granted standing to plaintiffs "who were entitled to a preference in the distribution of the foundation's assets." *Hooker*, 579 A.2d at 614 (citing *Alco Gravure*, 479 N.E.2d at 765). In that case, the foundation's "*primary* purpose was to assist employees of the founder's corporations and their families," although it was authorized "to benefit a broader class of charitable purposes." *Alco Gravure*, 479 N.E.2d at 754 (emphasis added). So too here, where the Settlement Agreement directs that the Fund "primarily" assist "persons in or from the People's Republic of China," Settlement Agreement § II.C.2, and the subsequent guidelines allegedly give "highest priority" to Chinese persons, SAC ¶ 51.

The defendants further insist that the proposed beneficiary class is "limitless" because it has "tremendous potential" to grow over time. Yahoo Br. 39. The *Hooker* court addressed, and rejected, a similar argument. 579 A.2d at 615. There, the defendants contended that the "class of potential beneficiaries includes 'all women' and so is limitless because any woman could [in the future] become poor and widowed" (and, presumably, move to Georgetown). *Id.* But the D.C. Court of Appeals focused instead on the standing of the "present members" of the class of potential beneficiaries. *Id.*[13]

---

[13] We note that, although D.C. law extends special interest standing not only to current trust beneficiaries, but also to *potential* beneficiaries, *see Family Fed'n for World Peace*, 129 A.3d at 245, the

2. The plaintiffs also plausibly allege that the class of beneficiaries they have described is sufficiently "limited in number." *Hooker*, 579 A.2d at 614-15. Drawing on a U.S. congressional database of all Chinese political prisoners, SAC ¶ 138, they plausibly estimate that the proposed class (as defined by the above criteria) currently consists of between 800 and 1,200 individuals, *id.* ¶ 141. The defendants assert that conferring standing on a beneficiary class of that size would be "unprecedented." Yahoo Br. 34. In *Hooker*, however, the complaint alleged a class of potential beneficiaries that numbered "in the hundreds, if not the thousands." *Hooker*, 579 A.2d at 611 (internal quotation marks omitted). Here, as there, those numbers are not too large to sustain a complaint against a motion to dismiss.

3. In sum, we conclude that the plaintiffs' allegations plausibly satisfy the two prongs of Hooker's "special interest" standing test.

First, the plaintiffs challenge "an extraordinary measure threatening the existence of the trust, hence raising an issue that, by its nature, could only be tried once." *Hooker*, 579 A.2d at 614-15. Accordingly, unlike a challenge "to an ordinary exercise of discretion on a matter expressly committed to the trustees," the probability of "recurring litigation" is low. *Id.* at 614-15.

Second, they plausibly satisfy *Hooker*'s requirement that they belong to a class of potential beneficiaries that is "sharply defined and . . . limited in number." *Id.* at 614. The "essence of a 'special interest' in a charitable trust is a particularized interest distinct from that of members of the general public." *Id.* at 613.

---

plaintiffs in this case are more than just potential beneficiaries. Six have previously benefited from the Fund. SAC ¶¶ 10-15.

Just as the members of the *Hooker* class plausibly alleged "a present opportunity to enjoy a direct benefit differing markedly from the incidental and indirect benefit the public realizes from the housing of indigent elderly widows," *id.* at 617, here the members of the proposed class plausibly allege an opportunity to benefit from the Fund that differs from the incidental and indirect benefit the public may realize from the Fund's humanitarian and legal assistance program.

III

For the foregoing reasons, we conclude that the plaintiffs plausibly allege that Yahoo created a charitable trust and that they have standing to enforce it. Accordingly, their complaint survives at the pleading stage. As the case proceeds, additional evidence may come to light that either supports or undermines those allegations. But "[h]owever the evidence may eventually turn out to be, we are not persuaded that any decision on this issue can be based on an inadequacy in the complaint." *Family Fed'n for World Peace*, 129 A.3d at 246.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*